NOT DESIGNATED FOR PUBLICATION

No. 126,114

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PATRICK ALEX NEWBORN,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Submitted without oral argument. Opinion filed December 19, 2025. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HURST, P.J., GARDNER and BOLTON FLEMING, JJ.

PER CURIAM: Patrick Alex Newborn appeals over 30 felony convictions after a jury trial, challenging three convictions as insufficiently supported by the evidence and one as multiplicitous. He also challenges the constitutionality of the rape statute and requests a new trial based on an allegedly erroneous exclusion of a prospective juror. Finding no reversible error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Patrick Alex Newborn with 49 offenses related to around 10 incidents that occurred in 2020, most occurring over the course of one month. The complaint listed 14 potential victims and primarily accused Newborn of aggravated burglary, aggravated battery, aggravated robbery, aggravated assault, aggravated kidnapping, rape, criminal threat, and illegal possession of a weapon.

Highly summarized, the underlying facts show that shortly after having been released from a prison for a felony conviction, Newborn was involved in a domestic battery involving his ex-girlfriend in June 2020. Then in August and September, Newborn illegally entered several homes and robbed and raped or otherwise victimized the occupants of those homes. After an investigation, police eventually located Newborn at an apartment on September 15. Newborn refused to comply with the officers' demands and a standoff ensued. A special weapons and tactics team responded to the incident. And after unsuccessfully negotiating with Newborn for his surrender, the team deployed gas into the apartment, which ultimately resulted in Newborn's arrest.

*Trial Proceedings*

At the jury trial in September 2022, the State argued that Newborn had "trespassed and burglarized four homes, robbed or attempted to rob eight people, kidnapped three people, raped five women, [and] made numerous threats to kill men, women, and children, . . . often while . . . armed with a knife or a gun." The State presented testimony from many witnesses. Relevant here, the State called K.A., E.G., M.R.M., and D.B. to testify about three incidents in which Newborn went into their homes and raped them at gunpoint, while committing other offenses as well.

Newborn testified in his defense. He admitted certain wrongdoings, including some criminal offenses, but denied most allegations related to his case. Newborn admitted that he was a member of a gang and had recently been released from prison, that he owned guns illegally, that he sold drugs, and that he had planned to flee to California by the time the police showed up to arrest him. Yet he denied committing nearly any of the crimes committed against K.A., E.G., M.R.M., and D.B. The three incidents involving these women are central to several of Newborn's appellate claims, so we recite them here.

*Trespass, Burglary, Theft, and Rape of K.A.*

K.A. testified that at around 4:15 a.m. on August 15, 2020, Newborn ran into her apartment as she reentered the apartment after taking her dog out. When Newborn entered the apartment, he pointed a gun at K.A. and, at one point, put the gun to the back of her head. Newborn demanded jewelry and walked into K.A.'s bedroom. As he looked through her things, K.A. told Newborn to take whatever he wanted. He looked through her purse and took $600. K.A. eventually tried to run away but fell on the floor. Newborn went over to K.A.'s bed and cornered her between the wall and the bed. She still struggled to get away, but Newborn pulled her toward him, got on top of her, raped her, and then left the apartment.

K.A. had previously seen Newborn once at a bar that she frequented. She also had a strange encounter with a man in her apartment before the forced entry on August 15 but did not know if Newborn was involved in that. She explained that she had a bad habit of leaving her keys in her door when she got home. One night in July, a man had come into her apartment at around 1 a.m. and tossed her keys to her in the dark. He stated something like, "[Y]ou'll thank me next time," and left. K.A. saw that the man had a gun in his hand, pointed toward the floor, but she could see only his silhouette.

3

Detective Melissa Burns testified that during an interview, K.A. stated that Newborn had a gun in his hand while he raped her. K.A. also told Burns that she did not try to fight Newborn during the rape because she was afraid of being injured. When asked at trial whether she was overcome by force, K.A. testified, "I just let him do it. I don't remember."

Newborn testified that he met K.A. at a bar and had a relationship with her before August 15. He also claimed that they had had consensual sex several times before that. As for the events on August 15, Newborn testified that K.A. had left her keys in her door that night and he let himself in. He heard music and walked straight to K.A.'s bedroom, where K.A. was lying down. They talked for a while then he left the bedroom to close the front door. When he got there, he saw K.A.'s purse and took several $100 bills from it. He admitted that he stole $500 or $600. He then returned to K.A.'s room where they had consensual sex. Newborn admitted that he had his gun with him at K.A.'s apartment and that she had seen the gun. But he testified that he had the gun because he was a drug dealer and needed it for protection.

Newborn denied ever raping K.A. He claimed that K.A. texted him after the incident. He argued that K.A. probably accused him of rape after she realized that he had stolen money from her purse.

*Kidnapping, Burglary, Robbery, Battery, and Rape of E.G. & M.R.M.*

Less than a week later at another apartment complex, another forced entry occurred. E.G. testified that on August 21, she and another person (Mycheal) spent the night at her friend M.R.M.'s apartment. They planned to do laundry and prepare for a friend's funeral the next day. They went to the laundry complex's shared laundry room but did not know the code to get in the locked door so M.R.M. yelled out to a man passing by to see if he knew the code. The man told them that his friend lived in the

4

complex, so he would ask him for the code, yet he returned around 20 minutes later without it. E.G. and M.R.M. then returned to their apartment.

Later, at around 3:30 in the morning, M.R.M.'s puppy needed to go outside, so E.G. took him out. As she got to the bottom of the stairs outside the apartment, she heard a gun cock. A man wearing a mask that covered his entire face pressed the gun to her head and told her that he would kill her if she made a sound. He then walked E.G. up the stairs and into the apartment at gunpoint.

When they entered the apartment, Mycheal was asleep on the couch and M.R.M. was in the bathroom. Newborn quietly demanded money from E.G., but E.G. showed him that she had none. He told E.G. to go into the bedroom then retrieved M.R.M. from the bathroom. Once E.G. and M.R.M. were both in the bedroom, he demanded money again and told both women to take all their clothes off and lie on the bed. He then raped E.G. by penetrating her with his hand. E.G. believed that Newborn sexually assaulted M.R.M. at the same time. He then hit E.G. on the head with his gun, knocking her down and rendering her partially unconscious.

M.R.M. testified that while in the bedroom, Newborn had removed his mask and had taken an empty safe from the room. As she got undressed, $160 fell out of her bra. Newborn saw this and took the money. According to M.R.M., Newborn pistol-whipped E.G. on the back of her head for taking too long to get her clothes off. M.R.M. had her cellphone with her throughout the encounter. She texted someone for help and later received a call. She answered the phone and screamed for help.

M.R.M.'s screaming woke Mycheal up. Newborn went to the living room and hit Mycheal with the gun. He told M.R.M. to get in the living room too and made her sit next to Mycheal on the couch. He hit her in the face with the gun and then forced his finger

5

inside her vagina. After he stopped, he threatened to shoot M.R.M. if she left the apartment. Then he took M.R.M.'s safe and left.

M.R.M. believed that the man from the laundry room and the person who committed the crimes in her apartment were the same person. She later identified Newborn in a photo lineup. At that time, she stated that she was 50 percent sure that Newborn was the assailant. She did not identify Newborn at the preliminary hearing but identified him at trial.

E.G. also believed that the man from the laundry room and the person in M.R.M.'s apartment were the same person. But before she testified, she told the district court that she was not confident that Newborn was that person. When asked whether the assailant was in the courtroom, she testified: "I can't be for sure, but . . . I really don't think it's him."

Newborn denied ever knowing or meeting E.G. or M.R.M. He claimed that after the State charged him, he realized that he knew M.R.M.'s brother. He suggested that E.G. and M.R.M. had accused him because they had seen his picture on the television after his standoff with the police.

*Robbery, Burglary, Assault, Rape, and Criminal Sodomy of D.B.*

D.B. testified that on September 12, 2020, Newborn, whom D.B. had never seen previously, appeared suddenly inside her home. He pointed a gun at her face and told her he was there to rob her. D.B.'s husband was not home, only she and her two youngest sons were in the house at that time. Newborn told D.B. that he wanted $5,000, jewelry, and guns. D.B. responded that she did not have those things. Newborn then demanded that D.B. remove her clothes. D.B. was seated in a chair in the living room and complied

by removing her pants. Newborn forced D.B. at gunpoint to touch herself, then he forced his penis into her mouth and raped her.

When this ended, Newborn stood up, and D.B. put her clothes back on. Newborn paced around the living room and ransacked the room. At one point, he told D.B. that he planned to take her to a bank to have her withdraw money for him. D.B. refused to leave the apartment because she would not leave her children alone. She asked if she could call her parents to have them bring Newborn money, but Newborn did not agree. Newborn continued to search for valuables, walking D.B. around the room at gunpoint as he searched. He eventually dumped the contents of a backpack onto the floor and found a car title and a few other things that he took.

After this, Newborn cocked his gun, pointed it at D.B., and told her to take her pants off again. He leaned her against the same living room chair where the initial rape occurred and raped D.B. again. Newborn threatened to kill her and her children if she told anyone what he had done. He also told her to put $5,000 under her porch doorstep. He said that he would return the next day to get the money and would leave the car title in exchange.

In his testimony, Newborn claimed that he knew D.B. and had sold her drugs. He first learned where D.B. lived because his father lived nearby. He denied raping D.B. but claimed that they had consensual intercourse.

*Verdict and Sentencing*

Of the 49 counts in the State's complaint, the jury convicted Newborn of 33 and acquitted him of 15. The district court dismissed the remaining charge.

7

In reaching this verdict, the jury rejected Newborn's defense that he did not commit the crimes against K.A., E.G., M.R.M., or D.B. The jury convicted Newborn of all the charges, including three counts of rape, related to K.A., E.G., and M.R.M. Newborn faced three other counts of rape and one count of criminal sodomy related to D.B. The jury acquitted him of one of the rape charges and criminal sodomy but convicted him of the remaining two counts of rape. The jury also found Newborn guilty of four counts of aggravated burglary, two counts of aggravated kidnapping, three counts of aggravated robbery, two counts of aggravated assault, and single counts of criminal trespass, theft, attempted aggravated robbery, and intimidation of a witness.

As for sentencing, Newborn moved for a durational or dispositional sentencing departure, which the district court denied. The district court sentenced Newborn to 2,162 months' (around 180 years) imprisonment. But the district court found the "Double Rule" applied to Newborn's sentence and thus ordered Newborn to serve 1,236 months in prison and 24 months in jail.

Newborn timely appeals.

ANALYSIS

I. *Did the District Court Abuse Its Discretion by Removing a Prospective Juror for Cause?*

Newborn first argues that the district court committed an error of law by dismissing a prospective juror (J.) for cause. He claims that the district court lacked authority to excuse J. for cause under K.S.A. 22-3410.

*Additional Facts*

Near the end of the first day of voir dire, the district court questioned J. about issues that he had relayed to the court's administrative aid. J. explained that he had worked at his current job for two years and had recently been offered a promotion. But to receive the promotion, he needed to complete a weeklong training in Kentucky that was scheduled to start the next Friday. J.'s employer had already booked a hotel for him and had paid for his flight. And after completing the training, J. would receive a $6 per hour raise. J. believed that if he had to reschedule the training, his employer would likely give the position to a different employee. He did not think that anyone had ever tried to reschedule the training at his job. J. also noted that his partner had recently had a baby, so J.'s family depended on J.'s income.

J. also told the district court that he needed to appear at a municipal court hearing that Thursday. As the discussion continued, J. also acknowledged that he was a "strong believer that the criminal justice system isn't fair," in part because of racism related issues. Still, he stated that if he were selected to serve on the jury, he could decide the case fairly.

The district court directed J. to check with his employer to find out whether his training could be postponed and to report back the next day. J. did this and informed the district court the next day that the training could not be rescheduled and that if he did not attend, the promotion would likely be given to someone else.

The prosecutor then moved to excuse J. "for cause." Defense counsel objected, arguing that they were "in a critical phase of the jury selection process." Defense counsel pointed out that two Black jurors had already been dismissed for cause, and the remaining potential jurors were primarily white or Hispanic. Defense counsel thus indicated that J.'s dismissal could result in a lack of meaningful diversity on the jury.

He noted the possibility that after going through 100 prospective jurors, Newborn could end up with no Black jurors.

Defense counsel did not make a *Batson* challenge, believing the argument applied only to peremptory challenges and not to challenges for cause, and the State moved to strike J. for cause. See *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the State from using peremptory strikes to remove prospective jurors based on their race.). Defense counsel also noted that employers are precluded from punishing an employee for performing their civic duty.

The prosecutor pointed out that the court had dismissed three other prospective jurors because they had prepaid flights scheduled. And J. had written in his questionnaire that he "wouldn't be fair because he felt the system was unfair as it pertained to sentencing." Defense counsel countered that J. had later told the court that he could be fair and impartial in deciding this case and had thus cured his previous statement.

The district court agreed that J.'s statement about the fairness of the justice system was a nonissue. Still, the district court granted the State's request to excuse J. for cause. It found that J. had a prepaid flight and other reservations, so J.'s excusal would be consistent with those decisions. It also found that J. needed to attend his already scheduled training to do his job and to obtain the raise that training would provide. The district court also briefly addressed *Batson* and found the State's stated reason for requesting J.'s excusal was race-neutral and Newborn had shown no discriminatory reason for the strike.

*Standard of Review and Basic Legal Principles*

The purpose of voir dire is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality. *State v. Bodine*, 313 Kan. 378, 405, 486 P.3d 551 (2021). Jury selection is a task particularly within the province of the trial judge. *State v. Miller*, 308 Kan. 1119, 1134, 427 P.3d 907 (2018). The nature and scope of voir dire examination is left to the sound discretion of the district court. Yet in deciding whether the district court has taken sufficient measures to ensure that the accused is tried by an impartial jury free from outside influences, appellate courts have the duty to independently evaluate the circumstances. *State v. Kahler*, 307 Kan. 374, 404, 410 P.3d 105 (2018). "An adequate voir dire is essential to protect a defendant's right to an impartial jury guaranteed by the Fifth and Sixth Amendments to the United States Constitution." 307 Kan. at 404.

Because a district judge is in a better position than this court is to make a jury selection ruling, appellate courts review the ruling on a for-cause juror challenge for abuse of discretion. See *State v. Flack*, 318 Kan. 79, 104, 541 P.3d 717 (2024). Thus, "to obtain reversal based on a district court's limitation on voir dire, the appellant must demonstrate both that the district court abused its discretion and that the appellant was prejudiced by that limitation." *State v. Robinson*, 306 Kan. 431, 444-45, 394 P.3d 868 (2017).

*We Find No Abuse of Discretion in Excusing J.*

K.S.A. 22-3410(2) lists nine grounds on which a party may challenge a prospective juror for cause. "Challenges for cause are to be tried to the court and decided in the discretion of the trial court." *State v. Mahkuk*, 220 Kan. 74, 75-76, 551 P.2d 869 (1976). As Newborn argues, employment-related matters are not included as a reason a potential juror may be excused for cause. See K.S.A. 22-3410(2).

11

But the State does not allege that any of the nine reasons stated in K.S.A. 22-3410(2) apply to J. The State asserts that the district court's reasoning shows that it did not rely on that statute. The State correctly notes that the district court never specifically referenced any statute when announcing its ruling. It contends that the district court was authorized to excuse J. for work-related reasons under a different statute—K.S.A. 43-159(c). This provision states that "persons for whom jury service would cause extraordinary or compelling personal hardship" may be excused from jury service by the court. K.S.A. 43-159(c). That decision rests in the district court's discretion. See *State v. Folkerts*, 229 Kan. 608, 617, 629 P.2d 173 (1981).

True, the district court granted the State's request to excuse J. "for cause." But we realize that parties often refer to any non-peremptory challenge as being "for cause," without distinguishing between a party's challenge for cause under K.S.A. 22-3410(2) that goes to a juror's actual or presumed bias, prejudice or partiality, and a party's request for the court to excuse a juror under K.S.A. 43-159(c) for reasons unrelated to a juror's state of mind. Under either statute, the district court may excuse a juror and when it does so, neither party uses a peremptory strike. So the nomenclature is not so important.

Still, the district court could have relied on K.S.A. 43-159(c) under the facts, which showed that J. had a prepaid flight and hotel reservations and could lose an important wage increase and employment opportunity if he were not excused. J. was shown to be a person for whom jury service would cause extraordinary or compelling personal hardship. K.S.A. 43-159(c). The district court had also excused other potential jurors for similar reasons, and stated its desire to be consistent. Given the district court's authority under K.S.A. 43-159, the district court's ruling was not an error of law as Newborn suggests, so the district court did not abuse its discretion by excusing J. The district court appropriately excused J. as allowed under K.S.A. 43-159(c), and we affirm its decision as right for the wrong reason. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021).

12

*Newborn Fails to Show Prejudice*

Yet even if we assume error, Newborn does not argue that prejudice resulted from the decision. He thus fails to meet his burden to give us an adequate basis to reverse his convictions and remand for a new trial. *Robinson*, 306 Kan. at 444-45.

Newborn argues that he need not show specific prejudice to succeed on this claim. He instead argues that the district court committed a reversible constitutional error by effectively giving the State an additional peremptory strike and thus greater control over the final composition of the jury. He notes that our appellate courts have not addressed this issue in a published opinion. But he argues that the United States Supreme Court in *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987), held that when this type of error occurs, it can never be treated as harmless. In other words, this court should find structural error because of the nature of the error committed by the district court's erroneous exclusion of J. from the jury.

This court rejected this argument in *State v. Sanchez*, No. 113,292, 2016 WL 4582544 (Kan. App. 2016) (unpublished opinion). The panel in *Sanchez* found *Gray* factually distinguishable and instead relied on our Supreme Court's analysis in *State v. McCullough*, 293 Kan. 970, 996, 270 P.3d 1142 (2012). We do the same.

In *Gray*, the United States Supreme Court held that certain errors cannot be properly evaluated for harmlessness:

> "'[S]ome constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.' The right to an impartial adjudicator, be it judge or jury, is such a right. . . . [A] capital defendant's constitutional right not to be sentence by a 'tribunal organized to return a verdict of death' surely equates with a criminal defendant's right not to have his culpability determined by a 'tribunal "organized to convict."' [Citations omitted.]" 481 U.S. at 668.

13

Though the Sixth Amendment no doubt protects a defendant's right to a fair and impartial jury, *Gray* is clearly distinguishable. *Gray* dealt with the exclusion of jurors due to their opinions about the death penalty. *Gray* and its progeny specifically considered the exclusion of venire members for cause in capital cases. 481 U.S. at 657-58. See *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). So *Gray*'s holding does not necessarily apply to the facts presented here—a noncapital case.

Our Supreme Court considered a similar issue in a noncapital case in *McCullough*, 293 Kan. at 996. In *McCullough*, the defendant challenged the district court's denial of five motions that she had made to strike jurors for cause. She claimed that the district court's denial of her motions caused her to waste some of her peremptory challenges and thus resulted in reversible constitutional error. Our Supreme Court rejected this argument, finding a defendant must show prejudice from the erroneous exclusion of a prospective juror, and prejudice cannot be established through the loss of a peremptory challenge alone. 293 Kan. at 996 ("'"[T]he loss of a peremptory challenge [does not] constitute [ ] a violation of the right to an impartial jury."'") (quoting *State v. Crawford*, 255 Kan. 47, 51-52, 872 P.2d 293 [1994]).

Our panel in *Sanchez* found that although *McCullough* addressed a slightly different argument, its analysis still applied:

"In both *McCullough* and this case, the defendants argued the district court erred in a ruling on a motion to strike and, as a result, the State wound up with more effective peremptory challenges. The only distinction is that McCullough argued she lost peremptory challenges while Sanchez contends the State received an extra peremptory challenge. This seems to be a more closely analogous case than a death penalty case dealing with the exclusion of jurors in a capital case solely because they voiced opposition to the death penalty." 2016 WL 4582544, at *6.

14

We agree with the *Sanchez* panel who, after *McCullough*'s guidance, determined that the defendant was "required to show specific prejudice from the erroneous exclusion of [the prospective juror] from the jury." 2016 WL 4582544, at *6. Sanchez "explicitly declined to do so" and thus failed to meet his burden of showing reversible error. 2016 WL 4582544, at *6.

The same is true here. Newborn declines to allege prejudice and instead argues that prejudice should be assumed. But to succeed on this claim, he needed to show both error and prejudice. See *Robinson*, 306 Kan. at 444-45; *McCullough*, 293 Kan. at 996. He thus fails to meet his burden to prove his right to relief from the district court's ruling.

II. *Is K.S.A. 21-5503 Facially Unconstitutional?*

Newborn next argues that the statute defining rape, K.S.A. 21-5503, is facially unconstitutional because it prevents consent-based defenses. That language that Newborn objects to states that "it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless." K.S.A. 21-5503(e). He asserts that this statute violates his right to due process because the 2010 recodification of the Kansas criminal code added language that essentially makes rape a strict-liability offense.

Newborn concedes that he did not make this argument in the district court, but he maintains that the record still permits meaningful appellate review of the issue. He claims that this is a purely legal question that can be decided by reviewing only the challenged statute. The State does not argue that Newborn has failed to preserve this issue, and we recognize that even if the district court had considered this question, this court would not be constrained by the district court's statutory interpretation. See *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024) (Statutory interpretation presents a question of law

over which appellate courts have unlimited review.). We thus reach the merits of this issue.

Newborn acknowledges that relatively recently, the Kansas Supreme Court rejected this argument in *State v. Thomas*, 313 Kan. 660, 488 P.3d 517 (2021). The court found that even if rape lacked an intent requirement, "nothing in our law suggest[s] due process prohibits the Legislature from adopting strict liability criminal offenses." 313 Kan. at 663. Newborn asserts that *Thomas* was wrongly decided. He argues that our Supreme Court failed to adequately consider the issue and improperly allowed the Legislature to remove consent-based defenses, which should be precluded only in cases involving minors.

But as an intermediate appellate court, we have a duty to follow the controlling precedent of the Kansas Supreme Court absent some indication the court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). Our Supreme Court has not signaled any intent to depart from its recent analysis in *Thomas*. Cf. *State v. Ford*, No. 124,236, 2023 WL 1878583, at *16 (Kan. App. 2023) (unpublished opinion) (applying *Thomas* in rejecting same constitutional due process claim), *aff'd* 320 Kan. 507, 571 P.3d 500 (2025).

In fact, our Supreme Court's recent decision in *State v. Ninh*, 320 Kan. 477, 492-93, 570 P.3d 1169 (2025), suggests the opposite. The appellant in *Ninh* also challenged the rape and aggravated criminal sodomy statutes as facially unconstitutional. He argued the statutes "allow for ad hoc and subjective enforcement" because they do not allow consent-based defenses. 320 Kan. at 492. Also, the statutes "allow a prosecutor to charge either crime 'knowing they do not have to prove the accused knowingly did anything other than have sex or sodomy.'" 320 Kan. at 492.

16

In rejecting this argument, our Supreme Court noted that the statutes do require the State to prove that the victim did not consent to the sexual acts. See K.S.A. 21-5503(e) (rape); K.S.A. 21-5504(f) (criminal sodomy). "The fact that the defendant cannot raise a particular defense does not relieve the State of its burden to prove [each of the offense's] elements beyond a reasonable doubt. And executive and judicial actors cannot enforce these statutes against individuals just for engaging in sex or sodomy." 320 Kan. at 492. Additionally, in enacting the rape and criminal sodomy statutes, "the Legislature did not improperly delegate its exclusive power to define criminal conduct to other branches of government, contrary to separation-of-powers principles." 320 Kan. at 492-93.

We thus follow *Thomas* and deny Newborn's argument that K.S.A. 21-5503(e) is facially unconstitutional.

III. *Does Sufficient Evidence Support Newborn's Conviction for the Aggravated Kidnapping of E.G.?*

Newborn challenges the sufficiency of the evidence supporting three of his convictions. In the first such claim, he argues the evidence failed to prove the aggravated kidnapping of E.G. Newborn concedes that the evidence proved simple kidnapping. But he claims the evidence failed to sufficiently prove the bodily harm necessary to support his aggravated kidnapping conviction. He does not challenge the significance or severity of the bodily harm imposed and instead claims that the kidnapping had ended by the time the bodily harm began.

*Standard of Review & Basic Legal Principles*

When a defendant challenges the sufficiency of the evidence to support a criminal conviction, "we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable

17

doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). This standard requires appellate courts to affirm a conviction on sufficiency grounds when some evidence in the record supports each element of the offense. See *State v. Parker*, 309 Kan. 1, 13, 430 P.3d 975 (2018) ("To meet the sufficiency standard, evidence must support each element of a crime."). "It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022).

*Discussion*

In an amended complaint, the State charged Newborn with aggravated kidnapping under K.S.A. 21-5408(a)(2). Under K.S.A. 21-5408(a), kidnapping is "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person" for a variety of statutorily identified reasons, including to "facilitate flight or the commission of any crime." K.S.A. 21-5408(a)(2). "Aggravated kidnapping is kidnapping, as defined in subsection (a), when bodily harm is inflicted upon the person kidnapped." K.S.A. 21-5408(b). Consistent with this language, the complaint alleged that Newborn took or confined E.G. by force, threat, or deception, "with the intent to . . . facilitate the commission" of two specific crimes—attempted aggravated robbery or rape—"and did inflict bodily harm."

Newborn concedes that the evidence at trial proved that he kidnapped E.G. because E.G. testified that he forced her up the stairs and into M.R.M.'s apartment at gunpoint. But he argues that the State did not prove the bodily harm element because the evidence showed that he hit E.G. with his gun only after the attempted robbery and rape ended.

18

We first address Newborn's argument that the bodily harm element was limited to his pistol-whipping of E.G. Newborn notes that when discussing the aggravated kidnapping charge during closing arguments, the prosecutor told the jury that the bodily harm element was established because Newborn "pistol whipped" E.G. And the only other charge and jury instruction related to E.G. was for aggravated battery, which reflected that Newborn inflicted bodily harm by hitting E.G. with the gun. Given this, Newborn argues the State was required to prove bodily harm based solely on the pistol-whipping.

We find Newborn's argument unpersuasive for several reasons. First, Newborn does not cite pertinent legal authority, such as a factually similar case, to support his claim. He thus fails to sufficiently brief this issue and thus risks having it dismissed. See *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020).

Second, the aggravated kidnapping statute, K.S.A. 21-5408(a)(2), does not require proof that bodily harm occurred during the initial taking of the person as Newborn tacitly suggests. Rather, it has been long recognized that "unnecessary acts of violence," including those that occur after the initial abduction, do constitute "bodily harm." *State v. Royal*, 234 Kan. 218, 222, 670 P.2d 1337 (1983). And although Newborn does not challenge the significance of the injury he inflicted, our Supreme Court has held that injuries like E.G.'s constitute bodily harm as a matter of law. See 234 Kan. at 222 (finding where knife or firearm is used during kidnapping and victim is wounded by the instrument, resulting injury constitutes bodily harm as matter of law). The State's evidence showed that E.G. was knocked down, rendered somewhat unconscious, and developed a large lump on her head from the pistol-whipping.

Third, Newborn's argument also ignores or improperly tries to distract from evidence showing Newborn raped E.G. during the kidnapping. He does not challenge that evidence or otherwise claim that the rape did not occur. And our Supreme Court has

19

"consistently held that rape as a matter of law constitutes bodily harm sufficient to support an aggravated kidnapping conviction." *State v. Peltier*, 249 Kan. 415, 418-19, 819 P.2d 628 (1991) (citing *State v. Brown*, 181 Kan. 375, 389, 312 P.2d 832 [1957] [recognizing rape was unnecessary, violent act not part of kidnapping and thus proved bodily harm]).

Fourth, although E.G.'s testimony suggested that Newborn first hit her after he stopped raping her, the evidence shows that Newborn hit E.G. with his gun before he delivered that blow—the one he admits to here. M.R.M. testified that Newborn also hit E.G. on the back of her head while she took her clothes off. And Newborn did not leave the apartment immediately after he hit E.G. after raping her. He instead remained in the apartment and continued to commit several offenses while E.G. was still confined to a bedroom.

For all these reasons, we find sufficient evidence supporting Newborn's conviction for aggravated kidnapping of E.G.

IV. *Does Sufficient Evidence Support Newborn's Conviction for Aggravated Kidnapping of M.R.M.?*

Newborn next asserts that insufficient evidence supports his conviction for the aggravated kidnapping of M.R.M. Relying on *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), he argues that any confinement of M.R.M. was incidental to the underlying offenses facilitated by the confinement—aggravated robbery and rape. The evidence thus failed to distinctly prove aggravated kidnapping.

*Overview and Applicability of* Buggs

In *Buggs*, our Supreme Court fashioned a test that applies when a defendant is convicted under the facilitation subsection of the kidnapping statute, now codified in K.S.A. 21-5408(a)(2). 219 Kan. 203, Syl. ¶ 10. A person commits a kidnapping under that subsection by taking or confining someone with the intent "to facilitate flight or the commission of any crime." K.S.A. 21-5408(a)(2). Because confinement can be inherent in some charged crimes, *Buggs* found that an expansive reading of this kidnapping statute would allow the State to overcharge a person who committed one of those types of crimes with a kidnapping in addition to the underlying crime. 219 Kan. at 216. *Buggs* thus held that the "kidnapping statute is not reasonably intended to cover movements and confinements which are slight and 'merely incidental' to the commission of an underlying lesser crime." 219 Kan. at 215. So for a taking or confining to constitute facilitation of a crime, it "must have some significant bearing on making the commission of the crime 'easier' as, for example, by lessening the risk of detection." 219 Kan. at 215.

The *Buggs* court devised a three-part test to determine whether the taking or confining was distinct from the underlying crime. 219 Kan. at 216. To be distinct enough to support a conviction under K.S.A. 21-5408(a)(2), the resulting movement or confinement:

"(a) Must not be slight, inconsequential and merely incidental to the other crime;
"(b) Must not be of the kind inherent in the nature of the other crime; and
"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

Our Supreme Court recently applied this test in *State v. Couch*, 317 Kan. 566, 533 P.3d 630 (2023), *abrogated on other grounds by State v. Garcia-Martinez*, 318 Kan. 681, 546 P.3d 750 (2024). In that case, Couch entered the victim's home, grabbed her, and

21

moved her throughout several rooms in the home while raping and sodomizing her in various ways. Applying *Buggs*, our Supreme Court found the evidence failed to establish that the taking or confining of the victim was done to facilitate anything other than the rape and aggravated criminal sodomy. *Couch*, 317 Kan. at 588-89.

Relying on *Buggs*, *Couch*, and similar cases, Newborn argues that M.R.M.'s confinement was incidental, inherent in the offenses of rape and aggravated robbery, and lacked significance independent of those other offenses.

The State counters that we should abandon the *Buggs* test. The State acknowledges that this court is duty bound to follow Kansas Supreme Court precedent absent an indication that the court is departing from its previous position. *Patton*, 315 Kan. at 16. But the State contends that our Supreme Court's recent dissenting opinions indicate an upcoming departure so this court is no longer duty bound to follow *Buggs*.

We agree that our Supreme Court has recently shown some indication of reconsidering *Buggs*. The concurring and dissenting opinions in *State v. Butler*, 317 Kan. 605, 533 P.3d 1022 (2023), and *Couch*—both decided by four-to-three majorities—support this. See *Butler*, 317 Kan. at 612 (Stegall, J., concurring) (concurring in judgment and citing *Couch*); *Couch*, 317 Kan. at 599-604 (Stegall, J., dissenting) (advocating for abandonment of *Buggs* because it is "untenable as a species of our multiplicity doctrine" and "fails as a matter of ordinary statutory interpretation").

Still, as another panel recently recognized, "the decision to overrule half-century-old precedent is left to our Supreme Court; it is not for us to decide." *State v. Turner*, No. 126,181, 2024 WL 5230295, at *5 (Kan. App. 2024), *rev. denied* 320 Kan. 868 (2025). Although this panel is not required to proceed the same way—*Kansas v. Fleming*, 308 Kan. 689, 706, 423 P.3d 506 (2018) (Kansas Court of Appeals panels may disagree with

22

a previous panel)—we elect to consider *Buggs* in reviewing Newborn's claim, assuming that it still applies.

*Even Under* Buggs*, the Evidence Sufficiently Proved Aggravated Kidnapping*

Newborn argues that he did not move M.R.M. throughout the apartment to make the aggravated robbery or rape substantially easier to commit or to lessen his risk of detection. He instead asserts that those actions simply made the crimes more convenient. He also notes that M.R.M. was already in the apartment when he entered and she kept her phone with her throughout most of the incident.

The State argues that Newborn's movement of M.R.M. throughout the apartment, which gave rise to his aggravated kidnapping charge, both made the aggravated robbery or rape substantially easier to commit and lessened his risk of detection for those crimes. The State asserts that Newborn moved M.R.M. throughout the apartment in specific ways to ensure that he maintained control of each person as they witnessed and/or endured his crimes.

After entering the apartment, Newborn moved M.R.M. from the bathroom to the bedroom with E.G. This allowed Newborn to control both women simultaneously. Mycheal was asleep in the living room. So by taking M.R.M. and E.G. past the living room and confining them to a separate bedroom, Newborn lowered the risk of Mycheal's seeing him or intervening to stop him. When Mycheal awoke, E.G. had already been hit and knocked to the ground. Newborn hit Mycheal with his gun and then made M.R.M. join them in the living room. Although this move inevitably caused Mycheal to witness the rape of M.R.M., it also increased Newborn's ability to watch and control Mycheal.

Both parties cite *State v. Chears*, 231 Kan. 161, 643 P.2d 154 (1982), as support for their respective arguments. In that case, Chears and another man entered a house

occupied by a married couple and their daughter. The men initially forced the family to lie on the living room floor. Chears then took the adult female to the bedroom and forced her to perform oral sodomy. On appeal, our Supreme Court rejected Chears' argument that moving the victim was merely incidental to the aggravated sodomy and did not facilitate the crime or lessen the risk of detection. The court explained that by removing the woman from the living room, Chears avoided additional witnesses and prevented the husband and daughter from interfering in the crime. 231 Kan. at 161-64.

Newborn argues that because he moved M.R.M. to a room with Mycheal, the opposite occurred here—he added another witness and made it easier for her to interfere in his crime. But this mischaracterizes the evidence. The evidence did not show that Newborn simply dragged M.R.M. through the apartment with no regard for his ability to avoid interference or detection. And nothing suggests that Newborn moved M.R.M. for sake of convenience. Although Newborn did not move M.R.M. to avoid detection by the other occupants of the apartment, his actions prevented E.G., M.R.M., and Mycheal from getting away or intervening.

A reasonable factfinder could have found M.R.M.'s confinement significantly made Newborn's crimes other than kidnapping easier to commit and lessened Newborn's risk of detection. The evidence was thus sufficient under *Buggs* to support Newborn's conviction for the aggravated kidnapping of M.R.M.

V. *Did the District Court Improperly Admit Hearsay Evidence at Trial?*

Newborn next contends that the district court abused its discretion by admitting a recording of a phone call that he made while in jail. He asserts that his statements during the call were inadmissible hearsay, so the district court violated his constitutional right to a fair trial by allowing the State to play the call for the jury.

24

*Additional Facts*

The State called Maria Heimerman, a detective who investigated Newborn's crimes, to testify several times throughout Newborn's trial. One of the topics that she addressed related to Newborn's involvement in the crimes against E.G. and M.R.M. During this testimony, the State moved to admit a recording of a phone call that Newborn had made to an unidentified female. During that call, Newborn told the woman that he had "snatched all her bread," referring to another woman, and referenced a figure of $160—the amount taken from M.R.M.

Defense counsel objected to the admission, arguing that "[u]nless the declarant or unless the other party is available[,] it's hearsay." The State responded that the "other party's statements" were not what the State intended to introduce. The district court denied Newborn's objection and allowed the State to proceed.

But defense counsel objected again that the evidence was inadmissible hearsay. Defense counsel claimed that the State had not shown that Newborn was one of the parties on the call, and that the other party was unidentified and had not been subpoenaed. The district court found this argument challenged foundation rather than hearsay, then it overruled Newborn's objection but allowed the State to lay additional foundation before playing the recording of the phone call for the jury.

*Preservation*

The State contends that Newborn's hearsay argument is unpreserved. Although Newborn made a hearsay objection, he explained that his objection was to the statements made by the unidentified woman, not to statements made by Newborn. And the district court overruled Newborn's objection, understanding that he was objecting to lack of foundation.

Our Supreme Court has emphasized the importance of a timely and specific objection to the admission of evidence at trial:

> "'"The purpose of the rule requiring a timely and specific objection is to give '"the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial."' [Citation omitted.]"'"
> In short, the trial court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error."' *State v. Hollingsworth*, 289 Kan. 1250, 1257, 221 P.3d 1122 (2009) (citing *State v. King*, 288 Kan. 333, 342, 204 P.3d 585 [2009], and *State v. Richmond*, 289 Kan. 419, 428-29, 212 P.3d 165 [2009]).

Newborn did not specifically object to his statements during the call as hearsay in order to ensure that the district court reviewed the evidence for that specific issue. Yet he has a duty to timely "make clear the specific ground of objection." K.S.A. 60-404. Newborn challenged the other person's statements as hearsay but obtained a ruling related to his statements that addressed only foundation requirements.

A party may not object at trial to the admission of evidence on one ground and then argue a different ground on appeal. *State v. George*, 311 Kan. 693, 701, 466 P.3d 469 (2020). So Newborn's hearsay claim is not properly raised here.

*Standard of Review*

But even if we err in this regard, Newborn has not given us sufficient reason to reverse his convictions. We review the admissibility of hearsay for abuse of discretion. A court abuses its discretion when its decision is founded on legal or factual error or no reasonable person could agree with the decision. *State v. Wash*, 320 Kan. 646, 688, 571 P.3d 568 (2025). We find no such abuse here.

26

*Any Error Was Harmless*

Hearsay is "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2024 Supp. 60-460. The theory behind the hearsay rule is that when a statement is offered as evidence of the truth of the matter stated, the credibility of the declarant is the basis for its reliability, and the declarant must therefore be subject to cross-examination. *State v. Race*, 293 Kan. 69, 76, 259 P.3d 707 (2011). Newborn testified at trial and was subject to cross-examination. K.S.A. 2024 Supp. 60-460(a) allows the admission of hearsay if it is "[a] statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by the declarant while testifying as a witness."

The State relies on two other hearsay exceptions: K.S.A. 2024 Supp. 60-460(f) and (g). K.S.A. 2024 Supp. 60-460(f) provides an exception for confessions made by the accused. And K.S.A. 2024 Supp. 60-460(g) allows admissions against a party's interest: "As against a party, a statement by the person who is the party to the action in the person's individual or a representative capacity and, if the latter, who was acting in such representative capacity in making the statement." Cf. *State v. Franklin*, 280 Kan. 337, 338-42, 121 P.3d 447 (2005) (defendant's text message to ex-boyfriend, suggesting she killed another woman, was an admission and therefore an exception to hearsay rule).

Newborn argues that the State cannot rely on these exceptions because it did not argue them in the district court. But that preservation rule applies to the party challenging the district court's decision, not to the appellee, here the State. And this court may affirm the district court as right for the wrong reason if we find an alternative basis for the court's ruling. See *State v. Parks*, 312 Kan. 487, 489, 476 P.3d 794 (2020); *State v. Keleti*, No. 126,429, 2024 WL 4579009, at *4 (Kan. App. 2024) (unpublished opinion) (affirming district court's exclusion of evidence as right for the wrong reason). K.S.A.

27

2024 Supp. 60-460(a) provides an alternative reason to affirm here. That exception allows the admission of hearsay if it is "[a] statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by the declarant while testifying as a witness." K.S.A. 2024 Supp. 60-460(a).

Although the district court did not consider any of these exceptions, the State's evidence satisfied the requirements under K.S.A. 2024 Supp. 60-460(a), (f), and (g) to allow Newborn's statements so we find they were properly admitted.

But even if the statements were improperly admitted, under K.S.A. 2024 Supp. 60-261 and K.S.A. 60-2105 a trial error is reversible only if it prejudices a defendant's substantial rights. Although Newborn characterizes this as a constitutional violation, he argues that the district court violated his statutory right to exclude hearsay evidence. So the statutory harmless error test applies. Under that test, the State, as the party benefiting from the assumed error, has the burden to show there is not "a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011).

The State sufficiently meets that burden here. E.G. and M.R.M. testified that Newborn stole money that fell out of M.R.M.'s clothing as she undressed. M.R.M. testified that the amount taken was $160. Newborn denied the accusation, thus forcing the jury to consider the witnesses' credibility. Because the jury ultimately convicted Newborn of all charged offenses against E.G. and M.R.M., the jury rejected Newborn's general denial of ever encountering E.G. or M.R.M. An appellate court cannot reweigh this evidence or replace the jury's credibility determinations with its own. *Mendez*, 319 Kan. at 723.

28

Although E.G. was unsure at trial that Newborn was the person who had committed the offenses at M.R.M.'s apartment, M.R.M. identified him as their assailant. M.R.M. explained that she had been too afraid to identify Newborn at the preliminary hearing and was still afraid of him at trial. Still, she confirmed that Newborn had committed the offenses in her apartment. And other circumstantial evidence tied Newborn to the crimes, including the similarities between the events that occurred at each of the victims' homes.

We find no reasonable probability that the assumed error affected the outcome of the trial in light of the entire record. Any error in the admission of the jail call as evidence at trial was thus harmless. See *Ward*, 292 Kan. at 569.

## VI. *Is One of Newborn's Two Convictions for Raping D.B. Multiplicitous?*

Newborn next raises a multiplicity argument challenging his two convictions for raping D.B. He claims that his actions toward her constituted one, unbroken instance of conduct. In other words, he committed only one act of rape and was thus wrongly convicted of two crimes. The evidence does not support this.

*Preservation*

Newborn concedes that he did not raise this issue in the district court. But he argues that appellate review may still be granted. He relies on two exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal. *Allen*, 314 Kan. at 283. In doing so and as required by Supreme Court Rule 6.02(a)(5) (2025 Kan. S. Ct. R. at 36), Newborn explains why this court should consider multiplicity for the first time on appeal. See *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019).

29

Newborn first claims that his multiplicity argument presents a purely legal question, and this court's decision would be finally determinative of the case. See *Allen*, 314 Kan. at 283 (newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case). He also argues that review should be granted to serve the ends of justice and prevent the denial of a fundamental right. He notes that our Supreme Court has considered multiplicity issues for the first time on appeal for these reasons—in the interests of justice and to prevent denial of fundamental rights. See, e.g., *State v. Gonzales*, 311 Kan. 281, 295, 460 P.3d 348 (2020).

The State does not challenge this issue as unpreserved or argue that this issue cannot be decided as a matter of law. And it is well established that "[t]he fundamental right of a defendant to a fair trial under the 5th and 14th Amendments to the Constitution of the United States would be violated by a multiplicitous conviction." *State v. Dubish*, 234 Kan. 708, 718, 675 P.2d 877 (1984). We thus choose to consider Newborn's multiplicity challenge. Cf. *State v. Burton*, No. 126,873, 2025 WL 817128, at *5 (Kan. App. 2025) (unpublished opinion) (applying same exceptions to preservation and granting review of unpreserved multiplicity claim).

*Standard of Review and Basic Legal Principles*

Multiplicity raises a question of law, so this court exercises unlimited review over the claim. *State v. Martin*, 318 Kan. 538, 545, 544 P.3d 820 (2024). And as needed to resolve the issue, we also review questions involving statutory interpretation de novo. *State v. Hirsh*, 310 Kan. 321, 338, 446 P.3d 472 (2019).

"[M]ultiplicity is the charging of a single offense in several counts of a complaint or information." *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2009). Newborn contends that Counts 36 and 39, which both charged him with raping D.B., are multiplicitous, citing K.S.A. 21-5109(e) ("A defendant may not be convicted of identical

30

offenses based upon the same conduct."). """The reason multiplicity must be considered is that it creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights."' [Citation omitted.]" *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48 (2006).

When a defendant is convicted of multiple violations of the same statute, we determine whether a conviction is multiplicitous by using a "well-established two-part test." *State v. Alston*, 318 Kan. 979, 983, 551 P.3d 116 (2024) (citing *Schoonover*, 281 Kan. 453, Syl. ¶ 1). Both components must be met for there to be a double jeopardy violation: "(1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?" *Schoonover*, 281 Kan. at 496.

*Unitary Conduct Not Shown*

Under the first part of this test, referred to as the "unitary conduct prong," we ask whether multiple convictions arise from the same conduct. In making this determination, we consider whether: (1) the acts occurred at or near the same time; (2) the acts occurred at the same location; (3) an intervening event occurred; and (4) a fresh impulse motivated some of the conduct. *Schoonover*, 281 Kan. at 497.

Newborn focuses his argument on the first two factors, arguing the time and place where the overall incident occurred shows that he committed a single rape. He argues that both acts of penile penetration occurred within around seven minutes of each other and took place on or near the same chair in the living room.

The State does not dispute these facts. But the State correctly argues that under the third and fourth factors—an intervening event and fresh impulse—of the unitary conduct test, the two instances of penile penetration constituted two distinct acts. As the State

argues, an intervening event occurred after Newborn first raped D.B. He paced the living room and ransacked the residence for things to take. He talked to D.B. about what he planned to do next. And finally, after finding a few items that he wanted to keep, he returned D.B. to the chair in the living room to commit the second rape.

This evidence also shows Newborn was motivated by a fresh impulse to commit the second rape. He had ample time to reconsider engaging in the sexually violent conduct. Also, D.B. had already put her clothes back on. Newborn also moved D.B. from the chair and led her around while he searched the house. So when Newborn decided to rape D.B. again, he made a separate demand for her to undress again and returned her to the living room chair where he raped her again. Newborn made a second conscious decision to do so. See *State v. Sellers*, 292 Kan. 346, 360, 253 P.3d 20 (2011) (finding defendant's leaving the room for 30 to 90 seconds after his first crime broke the chain of causality and gave defendant opportunity to reconsider his felonious course of action, so he had to make a second conscious decision to touch the victim the second time), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Newborn ended his sexually violent behavior and changed his course of conduct for several minutes while searching D.B.'s home. He also talked about his next plans. And by the time this intervening event ended, Newborn had to make a new, conscious decision to rape D.B. a second time.

We disagree with Newborn's contention that no intervening event happened here. He cites cases that we find factually distinguishable due to the length of the breaks between crimes and the nature of those breaks. See, e.g., *State v. Potts*, 281 Kan. 863, 872, 135 P.3d 1054 (2006) ("charges arose out of the same continuous transaction involving Potts' violent reaction to V.H. repeatedly refusing his sexual advances"); *State v. Henning*, No. 115,832, 2017 WL 3837224, at *8-9 (Kan. App. 2017); *State v. Gadbury*, No. 102,024, 2011 WL 135019, at *2, 10 (Kan. App. 2011). Those cases fail to show us that no intervening event occurred here.

32

Newborn's rape convictions do not stem from the same conduct. Because his argument fails under the first prong of the multiplicity test, we need not address the second prong of the test. His convictions for raping D.B. were properly charged and proven to be two crimes.

## VII. DOES SUFFICIENT EVIDENCE SUPPORT NEWBORN'S CONVICTION FOR THE RAPE OF K.A.?

Finally, Newborn asserts that insufficient evidence supports his conviction for raping K.A. He claims that K.A.'s testimony did not establish that she was overcome by force, as is necessary to sustain the conviction. See K.S.A. 21-5503(a) (defining rape as: "(1) Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse . . . : (A) When the victim is overcome by force or fear.").

After the State rested its case, Newborn moved for judgment of acquittal on this count. The district court agreed that the evidence did not establish that K.A. was overcome by fear, but it found "plenty of evidence" to establish that she was overcome by force. Consistent with that reasoning, the relevant jury instruction included only the "overcome by force" language.

K.A. testified that Newborn ran into her apartment before she could close the door after she had taken her dog outside. Newborn pointed a gun at her and, at one point, put it to the back of her head. He demanded jewelry then took her into her bedroom, where she tried to run away but fell on the floor. Newborn then cornered her between the wall and bed, pulled her toward him, got on top of her, and then he raped her.

Newborn argues solely that during K.A.'s testimony, the prosecutor asked whether she was overcome by force when Newborn pulled her toward him. K.A. replied: "I just

33

let him do it. I don't remember." Relying solely on this statement, Newborn argues that the jury could not have reasonably concluded that K.A. was overcome by force, as she merely acquiesced to his requests.

But other evidence is relevant to the issue of whether K.A. was overcome by force. Detective Burns testified that in an interview, K.A. told her that Newborn had the gun in his hand while he raped her, and that she did not try to fight him off during the rape because she did not want to get injured.

We must decline Newborn's invitation to give more weight to K.A.'s statement than to the rest of the evidence. The jury heard K.A.'s testimony, weighed it, and considered all the evidence in reaching its verdict. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *Mendez*, 319 Kan. at 723. The evidence admitted at trial, viewed in the light most favorable to the State, shows that a rational factfinder could have found the defendant guilty beyond a reasonable doubt of raping K.A.

Affirmed.