IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,471

STATE OF KANSAS,
*Appellee*,

v.

DAVONTRA LEONARD ALSTON,
*Appellant*.

SYLLABUS BY THE COURT

1.

A conviction for premeditated first-degree murder under an aiding and abetting theory is not duplicitous of a conviction for conspiracy to commit first-degree murder even when the two convictions are based on the same act. Even if the two convictions involve a single act of violence, they are different offenses because the convictions arise from violations of different statutes with different elements. The convictions thus do not violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution or § 10 of the Kansas Constitution Bill of Rights and are not prohibited under K.S.A. 21-5109(d) or (e).

2.

K.S.A. 22-3501 empowers a district court to grant a defendant's motion for new trial if required in the interest of justice. Appellate courts review a district court's denial of a motion for new trial for abuse of discretion, which occurs if an action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. The party seeking the new trial has the burden of demonstrating an abuse of discretion.

1

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Oral argument held November 1, 2023. Opinion filed July 5, 2024. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jodi Litfin,* deputy district attorney, argued the cause, and *Kris W. Kobach*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.: Davontra Alston was convicted by a jury of premeditated first-degree murder, felony first-degree murder, conspiracy to commit first-degree murder, and criminal discharge of a firearm at an occupied vehicle for his participation in the 2020 shooting death of D'Angelo Payne in Topeka. In this direct appeal of the jury verdict, Alston argues his conviction for premeditated first-degree murder under an aiding and abetting theory is duplicitous of his conviction for conspiracy to commit first-degree murder. He contends this means the State has charged him in multiple counts for committing a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. He also contends the district court abused its discretion in denying his motion for new trial in which he argues the State mischaracterized evidence, the district court erroneously admitted hearsay evidence, and the State committed prosecutorial error.

We reject Alston's claims and affirm his convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

The State's theory of prosecution was that Alston conspired with Diquan Clayton, who is Alston's cousin, and James Boatwright to murder Payne and that he aided and

2

abetted Boatwright and others in the murder. The State built a circumstantial case based on evidence that Clayton and Alston resented Payne's relationship with Danielle Morrison and they felt Payne had disrespected Morrison, Alston, and his family. At the time of Payne's murder, Clayton had a romantic relationship with Morrison, and she lived with Alston and his family. But she had previously had a romantic relationship with Payne, and they shared a car. Some other background helps explain the basis for the State's two theories about the source of the conflict between Payne and Alston.

First, as to the theory Payne had been disrespectful, weeks before Payne's murder, he came to Alston's house to retrieve the car from Morrison. Morrison refused to give him the keys, and Payne stood outside the house, yelling Morrison's name, and kicking the door. Alston later learned of the incident and expressed his view that Payne's conduct had been disrespectful to him and his family. He told Morrison that Payne would need to pay for his conduct and should not return to the house.

Second, Payne and Clayton had a history of tense, jealous interactions. Payne sent pictures of guns to Clayton and had Morrison tell Clayton that Payne wanted to meet up and fight. Clayton replied that he "didn't have time for it." Even so, evidence supported the theory that Clayton resented Morrison's ongoing contact with Payne. This resentment affected Alston's feelings and behavior as well, according to the State. The State emphasized that Alston and Clayton are cousins who grew up together and considered each other brothers to the point Alston viewed an enemy of Clayton as an enemy of his.

On the day Payne died, he came to Alston's house to speak with Morrison. He parked next door, and Morrison joined him in the car where they discussed their relationship. Clayton and Alston were initially inside Alston's house with Alston's family and others while Morrison was in the car, but Clayton left to get some food. Clayton texted Morrison, but she did not answer because she did not have her phone with her. One of the texts said: "He said you better get out the car that MF finna get shredded."

After talking with Payne for about an hour, Morrison returned to the house. She heard Alston say "he was leaving now in a Ford Taurus," but she did not know who Alston was speaking to. Clayton had also returned, and Morrison heard Alston say to Clayton, "[M]y nigga' James doesn't play." A while later, Alston was laughing and showing his phone to Clayton but would not let Morrison see the phone. Eventually, Morrison was able to look at the phone and saw a text from an unknown number that said, "[J]ob done." She later saw news reports on Facebook about a shooting and noticed posts from Alston's Facebook accounts showing a laughing reaction to the news.

While all this was taking place Boatwright was hanging out with some other men. Boatwright received a phone call, after which he asked one of the other men to take him to "make a play." The man took the request to mean that Boatwright wanted to possibly sell drugs. A third man joined them, and they got into Boatwright's car with Boatwright in the front passenger seat. They drove to Alston's residence. After seeing there were no cars parked nearby, they left.

As they drove, they spotted Payne's car. Occupants in Boatwright's car fired shots toward Payne as they drove by. Police responded to the shots and found Payne's wrecked car. Inside, Payne was dead from a gunshot to the back of his head.

The driver of Boatwright's car was later arrested, and he told police Boatwright was involved in the shooting. Police searched Boatwright's home and found a firearm that matched some shell casings found at the shooting scene. But testing determined that firearm did not shoot the bullet that killed Payne.

The police's investigation also led them to interview Alston. He denied knowing Boatwright, but he borrowed a detective's phone to make a call. During the call, he said the police "had James." The police also obtained cell phone and social media records for

4

Alston, Boatwright, Clayton, Morrison, and the others. These records reflected several text messages, Facebook messages, or phone calls exchanged between Alston and Boatwright and Clayton and Boatwright, including communications around the time of Payne's death. Some of these communications were incriminating, as were statements they made to others. For example, when Alston was asked by another of his cousins if he was at the location of the shooting, Alston replied that he was not there, and he added that he has "people who do that for him." The State argued that statement and others proved Alston conspired to commit murder and that he had issued the order to act.

The jury convicted Alston based on this circumstantial evidence. Before sentencing, Alston moved to dismiss the murder and conspiracy convictions as multiplicitous. Alston argued his conviction for conspiracy to commit premeditated murder "covers all the conduct alleged by the State which was attributable directly to" him and his remaining three convictions should be set aside.

Alston also filed a motion for a new trial, alleging several trial errors. The district court denied both motions but determined Alston's felony murder conviction merged with his first-degree premeditated murder. The district court sentenced Alston to life with a mandatory minimum sentence of 618 months in prison for his conviction of premeditated first-degree murder and concurrent sentences for conspiracy to commit first-degree murder and criminal discharge of a firearm at an occupied vehicle.

Alston appealed. This court's jurisdiction is proper. K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals); K.S.A. 22-3601(b) (direct appeals to the Supreme Court of class A felony, life sentence imposed, or off-grid crime); K.S.A. 21-5402(b) (first-degree murder is an off-grid person felony).

ISSUE 1:  ALSTON'S CONVICTIONS ARE NOT MULTIPLICITOUS.

We first address Alston's contention that sentencing him for both first-degree premeditated murder under an aiding and abetting theory and conspiracy to commit first-degree murder violated his constitutional right to be free from double jeopardy. The basis for Alston's argument is the double jeopardy principle that prohibits punishing a criminal defendant twice for the same offense. See *State v. Crudo*, 318 Kan. 32, 43, 541 P.3d 67 (2024); *State v. Schoonover*, 281 Kan. 453, 467, 133 P.3d 48 (2006). To determine whether multiple punishments relate to the same offense when convictions arise under different statutes, Kansas courts apply a well-established two-part test. Double jeopardy does not attach unless both prongs of the test are met. *Schoonover*, 281 Kan. 453, Syl. ¶ 15.

Under the first prong, Kansas courts ask whether multiple convictions arise from the same conduct; we often refer to this as the unitary conduct prong. *Schoonover*, 281 Kan. 453, Syl. ¶ 15. Here, the ultimate criminal act is the shooting and killing of Payne. That killing was the object of the premeditated first-degree murder charge and was the alleged overt act required to prove the conspiracy. But no evidence suggests that Alston pulled the trigger and shot Payne. Instead, the State relied on evidence it argues proved Alston's involvement in a conspiracy to commit the murder and to prove he aided and abetted the person who fired the lethal shot. The State summarized this evidence during its closing argument by telling the jury it proved that Alston gave "directions, commands, orders to the person who will eventually murder Mr. Payne, and convey[ed] that information to the people who eventually [had] to drive to" Alston's house where Payne was sitting in the car. From there, those individuals drove by Payne's car and fired the deadly shot. The parties agree this unitary conduct underlies both counts, and the record supports that conclusion. Alston has thus met the first prong of the test.

6

Under the second prong, if, as here, the convictions arise from different statutes, Kansas courts apply the same-elements test to determine whether the defendant was twice found guilty of the same offense. Under that test we examine "'whether each offense contains an element not contained in the other; if not, they are the "same offense" and double jeopardy bars additional punishment and successive prosecution.'" 281 Kan. at 467 (quoting *United States v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L. Ed. 2d 556 [1993]). On the other hand, if the elements of the statutes differ, the defendant is not punished twice for the same offense and double jeopardy does not attach. 281 Kan. at 467.

To examine the elements, we must interpret the involved statutes, an examination that presents us with a question of law. 281 Kan. at 462.

The two statutes involved here are K.S.A. 21-5402, which defines the elements of premeditated first-degree murder, and K.S.A. 21-5302, which defines a conspiracy. As relevant to Alston's charges, K.S.A. 21-5402 defines murder in the first degree as

- "killing of a human being"
- "[i]ntentionally, and with premeditation." K.S.A. 21-5402(a)(1).

K.S.A. 21-5302(a) defines a conspiracy as

- "an agreement with another person"
- "to commit a crime or to assist in committing a crime."

The statute adds that "[n]o person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or by a co-conspirator."

7

This review reveals that murder and conspiracy are not the same offense because each contains elements not included in the other. Murder does not require the involvement of more than one person, but conspiracy does. And murder penalizes killing, while conspiracy penalizes the agreement. As this court has said, conspiracy is a separate crime from the substantive offense the conspirators agree to commit "because the agreement itself is the harm and deserves punishment." *State v. Cottrell*, 310 Kan. 150, 155, 445 P.3d 1132 (2019). Thus, the Double Jeopardy Clause does not bar separate punishments for the substantive crime of murder and for conspiracy to commit the murder. See *Pereira v. United States*, 347 U.S. 1, 11, 74 S. Ct. 358, 98 L. Ed. 435 (1954) ("It is settled law in this country that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is no defense to a conviction for both.").

That long-standing analysis does not fit this situation, according to Alston, because the State pursued a first-degree murder count premised on aider and abettor liability charges. He emphasizes that the State asked the district court to instruct the jury on the concept of aiding and abetting by listing all the statutory alternatives for aiding and abetting liability, and the district court granted the request. Under those alternatives, "[a] person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime." K.S.A. 21-5210(a). Alston argues that procuring another to commit the crime equates to conspiring. This overlap, he contends, makes the two crimes multiplicitous. But Alston acknowledges that this court rejected his argument in *State v. Mincey*, 265 Kan. 257, 963 P.2d 403 (1998).

In *Mincey*, the defendant was convicted of aiding and abetting attempted first-degree murder and conspiracy to commit first-degree murder, as well as aiding and abetting aggravated robbery and conspiracy to commit aggravated robbery. The evidence

8

established that the defendant agreed to rob someone, discussed killing the victim if necessary, and helped her coconspirators plan the crime. She then argued the conspiracy count duplicated charges based on aiding and abetting the same substantive offenses. In a straightforward statutory analysis like that outlined above, the court found that aiding and abetting the substantive crimes and conspiracy had different elements and were not multiplicitous charges. "Conspiracy requires an agreement to commit a crime, while aiding and abetting requires actual participation in the act constituting the offense." 265 Kan. at 266.

We note that *Mincey*, 265 Kan. at 266, includes dicta that can be confusing. The court speculated about what its holding might have been had the defendant only helped plan the crime—that is, if both convictions rested on a single act—and concluded a double jeopardy problem might arise. This dictum conflates the unitary or same conduct test with the elements test, something we disapproved of about eight years later in *Schoonover*, 281 Kan. at 492-95.

In *Schoonover*, we noted that this court had developed two divergent lines of multiplicity cases, one line held that two counts merged when they arose from a single act and the other line used the two-prong test of unitary conduct plus an analysis of whether the statutes set out differing elements. We concluded the single act/merger line did not reflect the holdings of the United State Supreme Court, and we rejected use of the single act (same conduct) as an appropriate double jeopardy test when used as the sole test. We clarified that due process was violated only when two punishments were imposed for a single offense, which requires meeting the two prongs of unitary conduct *and* having multiple statutes that require the same elements of proof. See *Schoonover*, 281 Kan. 492-95.

Defining a single offense under this two-prong test adheres to *Mincey*'s holding that "[c]onspiracy and aiding and abetting another offense are not multiplicitous." That is

9

because "[e]ach offense requires proof of an element not required by the other." *Mincey*, 265 Kan. at 266.

*Mincey*'s holding also follows the caselaw of the United States Supreme Court and many other courts that recognize the same evidence—such as evidence of an agreement—often proves both a conspiracy and the theory that the defendant aided and abetted the commission of the underlying, substantive crime. These cases emphasize that while the same evidence can prove both crimes, the government can prove a defendant aided and abetted a crime without proving the defendant conspired with others. The United States Supreme Court explained, "The essence of the conspiracy charge is an agreement" but "[a]iding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy." *Pereira*, 347 U.S. at 11-12. The United States Supreme Court thus concluded that double jeopardy does not prevent convicting a defendant of a substantive crime based on evidence the defendant aided and abetted the person who committed the crime and convicting the defendant of conspiring to commit the substantive crime. "[T]he charge of conspiracy requires proof not essential to the convictions on the substantive offenses—proof of an agreement to commit an offense against the United States—and it cannot be said that the substantive offenses and the conspiracy are identical." 347 U.S. at 11-12.

Federal courts applying *Pereira* have reiterated this point by noting that under federal criminal law "the typical case of aiding and abetting . . . involves a 'knowing concert of action pursuant to agreement.'" But that does not mean double jeopardy prevents a conviction of conspiracy as well as a conviction for a substantive crime that depends on an aiding and abetting theory. *United States v. Herbert*, 698 F.2d 981, 985 (9th Cir. 1983). This is true "even where the evidence adduced serves 'double duty' in establishing the elements of both offenses." *United States v. Cowart*, 595 F.2d 1023,

10

1033 (5th Cir. 1979). Imposing sentences for two convictions—one as a conspirator and one as a principal under an aiding and abetting theory—thus does not violate double jeopardy principles. See, e.g., *United States v. Blanton*, 531 F.2d 442, 444 (10th Cir. 1975). *Mincey* and our holding today reflect the caselaw of the United States Supreme Court and other federal courts recognizing that the difference in the elements of the two offenses means the counts are not multiplicitous and do not violate the Double Jeopardy Clauses of the United States and Kansas Constitutions even if evidence of an agreement is used to prove both.

Finally, Alston argues he is entitled to relief under two provisions of K.S.A. 21-5109, a statute relating to multiple convictions, even if his constitutional argument fails. He specifically cites subsection (d), which addresses the relationship between general and specific offenses, and subsection (e), which states the identical offense doctrine. We conclude neither provision requires us to set aside his convictions.

The first of these subsections, K.S.A. 21-5109(d), prohibits convictions for two crimes based on the same conduct "when crimes differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct." As we have discussed, while there may be overlap between the proof of aiding and abetting and conspiracy, the two statutes are aimed at different evils and serve different purposes with one aimed at the agreement and the other holding the defendant liable as a principle for a substantive crime regardless of whether the defendant agrees with others to commit the crime. *Cottrell*, 310 Kan. at 155. We conclude that a conviction for first-degree murder proved under a theory of aiding and abetting and a conviction for conspiracy to commit murder are convictions for different kinds of conduct. Neither is more general nor more specific than the other because each targets a different theory of liability. The two statutes therefore fall outside the prohibitions of K.S.A. 21-5109(d).

11

This brings us to K.S.A. 21-5109(e), the second subsection Alston cites. It provides, "A defendant may not be convicted of identical offenses based upon the same conduct." We see nothing in this language that supports interpreting K.S.A. 21-5019(e) to provide different protections against multiplicitous offenses than the protections already provided by constitutional protections against double jeopardy. In fact, K.S.A. 21-5109(e) codifies the caselaw that applies the identical (or same) offense doctrine applied by both the United States Supreme Court and this court. See *Schoonover*, 281 Kan. at 467 (quoting *Dixon*, 509 U.S. at 696, for the proposition that the double jeopardy test asks "'whether each offense contains an element not contained in the other; if not, they are the "same offense" and double jeopardy bars additional punishment and successive prosecution'"). Alston's arguments focus exclusively on his unitary conduct and ignore the statutory requirement that the two convictions must involve the "same offenses." Our caselaw emphasizes that the "Fifth Amendment's prohibition against multiple prosecution and punishment for the 'same offence' is a different concept from a prohibition against multiple prosecution or punishment for the 'same conduct.'" *Schoonover*, 281 Kan. at 465. K.S.A. 21-5109(e) adopts the "same offense" terminology. Thus, contrary to Alston's argument, K.S.A. 21-5109(e) provides him no greater protection than granted him under the Double Jeopardy Clauses of the United States and Kansas Constitutions. As we have discussed, conspiracy and murder under an aiding and abetting theory are not the same offense. *Pereira*, 347 U.S. at 11-12; *Mincey*, 265 Kan. at 266.

Each of Alston's arguments about multiplicity essentially asks us to abandon the same-elements test and instead focus solely on the facts of his case. We reject the invitation to stray from the well-established tests used by this court and by the United States Supreme Court. See *Pereira*, 347 U.S. at 11; *Schoonover*, 281 Kan. at 467. Alston's convictions do not violate double jeopardy constitutional protections, nor do they conflict with K.S.A. 21-5109.

12

ISSUE II:  ALSTON IS NOT ENTITLED TO A NEW TRIAL.

After the verdict, Alston filed a motion for a new trial, alleging that the following errors mandated a new trial in the interests of justice:

(a) The State published a slide to the jury that inaccurately recounted a detective's testimony.

(b) The district court erred in allowing a witness to testify about her observation of a text message from an unknown sender.

(c) And the prosecutor erred in using examples to illustrate reasonable doubt.

K.S.A. 22-3501 empowers a district court to grant a new trial on a defendant's motion "if required in the interest of justice." Appellate courts review a district court's denial of a motion for new trial for abuse of discretion. *State v. Breitenbach*, 313 Kan. 73, 97, 483 P.3d 448 (2021). An abuse of discretion occurs when an action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Alston as the movant has the burden of demonstrating an abuse of discretion. *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021). We conclude he failed to meet this burden.

a.  *Misstatement of Evidence*

The State presented testimony by a detective, who created a slide presentation that showed a timeline of events related to Payne's murder. One of the slides purported to quote Morrison saying she overheard Alston tell Clayton that "[m]y nigga James [allegedly referring to James Boatwright] don't play. They get things done." When the slide was displayed, Alston's counsel objected, arguing it did not reflect Morrison's trial

13

testimony because she testified only that she heard Alston say, "My nigga James don't play." The State immediately agreed to correct the slide and did so. Without further objection or a motion for mistrial, the testimony continued.

In his postconviction motion, Alston argues displaying the words "[t]hey get things done" to the jury was prejudicial because those words imply that Alston had asked others to do the shooting. He contends that once those words were published to the jury the damage was done and would remain in the jurors' minds.

In ruling on Alston's motion, the district court judge disagreed and determined the prosecutor's mistake did not require a new trial. The judge found no evidence of bad faith and concluded the statement did not mislead the jury. The judge noted that the State recognized the mistake and quickly took the slide down and corrected it. Alston does not argue the judge made an error of fact in recounting what occurred at trial. Nor does he argue the judge made an error of law. Instead, he argues the judge reached an unreasonable conclusion. Our review of the record convinces us that the judge reached a conclusion consistent with the entire record when he determined the State had not acted in bad faith and the jury was not misled by the brief display of the extra words. The State cured the misstatement, and the jury could observe the difference in wording. While the judge did not immediately admonish the jury to not consider the first version (and was not asked to), the judge later instructed the jury to disregard anything not supported by evidence. And jurors are presumed to follow such instructions. *State v. Brown*, 316 Kan. 154, 170, 513 P.3d 1207 (2022). Nothing suggests they failed to follow the instruction.

We see no error of law, no error of fact, or anything arbitrary, unreasonable, or fanciful in the district court's denial of Alston's motion for new trial because of the erroneous quotation on the slide. Cf. *State v. Thomas*, 307 Kan. 733, 415 P.3d 430 (2018) (prosecutorial error in misstating evidence was harmless beyond a reasonable doubt when defense attorney clarified testimony in closing and district court instructed jury to

14

disregard any statement not supported by evidence). We affirm the district court's decision to reject Alston's contention that the erroneous slide required setting aside the verdict and granting a new trial.

### b. Hearsay

Next, Alston seeks a new trial because the district court judge admitted evidence that Alston now argues is hearsay. The State introduced this evidence during Morrison's testimony when she testified that she noticed Alston showing his phone to Clayton and laughing. Alston would not let Morrison see his phone. But later she saw his phone and a text from an unknown phone number that said, "[J]ob done." Alston's counsel did not object to this testimony. During cross-examination he asked Morrison about the text but only to verify that she did not recognize the phone number.

On appeal, Alston does not explain how either the district court judge or this court could grant a new trial when no objection was made at trial given that K.S.A. 60-404 prohibits setting aside a verdict or reversing a judgment based on the erroneous admission of evidence unless a timely objection has been made. See *State v. Solis*, 305 Kan. 55, 62-63, 378 P.3d 532 (2016) (timely objection required to preserve evidentiary claims for appellate review). We hold that Alston's failure to object to the admission of the text message at trial means the district court was precluded by K.S.A. 60-404 from setting aside the judgment and granting a new trial. We thus conclude the district court did not err in denying Alston's motion for new trial on this basis.

### c. Prosecutorial Error

Finally, Alston argues the prosecutor erred when presenting the State's case to the jury. Generally, a prosecutor is allowed wide latitude "'to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial.'" *State v.*

*Coleman*, 318 Kan. 296, 302, 543 P.3d 61 (2024). Prosecutors exceed their wide latitude when they do such things as "misstate the law applicable to the evidence, comment on witness credibility, or shift the burden of proof to the defendant." 318 Kan. at 302. When prosecutorial error is alleged, we consider the statements in context to determine whether the prosecutor erred. 318 Kan. at 302.

If the prosecutor errs, a reviewing court considers whether the error is reversible. Courts apply the traditional constitutional harmless error standard to determine reversibility. 318 Kan. at 302-03 (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]). "Under that test, 'prosecutorial error is harmless if the State can demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict."'" *Coleman*, 318 Kan. at 303 (quoting *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 [2016], which quoted *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

Alston alleges the prosecutor erred during voir dire when discussing the concept of reasonable doubt with the jurors. He cites two specific passages and contends the prosecutors "undermined the beyond a reasonable doubt standard through the 'extreme and ridiculous' examples" used.

In the first passage, the prosecutor asked whether jurors saw a difference between a reasonable doubt and all doubt. Several jurors responded that they understood the difference and explained their reasoning and their understanding of the two concepts. After several jurors spoke, one juror suggested there was a difference between reasonable and unreasonable doubt. A prosecutor responded by saying, "Sure . . . what if somebody stands up and says, well, the defendant didn't commit the crime. Body snatching aliens did it. And if the State . . . cannot prove that these aliens don't exist [, w]ould you say that that's an unreasonable doubt?" After that brief exchange, the prosecutor returned to the

16

difference between beyond a reasonable doubt and beyond all doubt, without further talking about a line between reasonable and unreasonable doubt. Throughout voir dire and again during closing arguments, the prosecutor stressed the State had the burden to prove the facts beyond a reasonable doubt. For example, near the end of the State's questions to prospective jurors, a prosecutor said the State "cannot and we will not define what beyond a reasonable doubt means, but there is one thing that we can say, and that is beyond a reasonable doubt does not mean the same thing as beyond all doubt."

The district court judge, in denying Alston's motion for new trial, noted the context for the mention of the alien body snatchers. He also observed that the prosecutors never attempted to define beyond a reasonable doubt and correctly stated the law—both during voir dire and closing arguments. Alston does not dispute this conclusion but labels the alien body snatcher example as ridiculous, suggesting it trivialized the State's burden of proof. We disagree. If anything, the example did the opposite and suggested that an unreasonable doubt was something extreme and outrageous—like body snatching aliens. The prospective jurors' responses suggested they understood that reasonable doubt did not need to be outrageous and extreme but could be anything that caused the jury to reasonably doubt the State's case. They mentioned common and legitimate reasons that might cause them to have a reasonable doubt—the State's failure to prove an element, a noncredible witness, a witness with an apparent bias, contradictory evidence, the frailties of eyewitness accounts, and other potential weaknesses in the State's case.

In the context used, we find no error in the State using a body snatching alien as an example of unreasonable doubt.

The second voir dire passage about which Alston complains relates to a prosecutor's explanation of circumstantial evidence. The prosecutor asked a juror to imagine that the juror could not see out the windows but heard thunder and saw someone covered with water and holding an umbrella. The prosecutor asked the prospective juror,

17

"What would you infer is going on outside?" The prospective juror answered, "Thunderstorm." Later, during closing arguments, the prosecutor cited the example again and observed, "You can't directly see it, but you know what it is through circumstantial evidence. . . . We're asking you to do the same thing in this case," conceding the State had little direct evidence and its case rested on circumstantial evidence. The prosecutor later reminded the jury that "it is not our job to give you our opinions about the credibility of the witnesses or the evidence. It is your job to decide what weight to give to that evidence."

Again, we fail to see how the State's example undermined the concept of beyond a reasonable doubt. The example explained the concept of circumstantial evidence—that is, "any evidence that '"tends to prove a fact in issue by proving other events or circumstances which afford a basis for a reasonable inference by the jury of the occurrence of the fact in issue."'" *State v. Corbett*, 281 Kan. 294, 309, 130 P.3d 1179 (2006) (quoting *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 [2003]). All the prosecutor did was suggest one could reasonably infer there was a thunderstorm from the known facts of an umbrella, a wet person, and the sound of thunder. The prosecutor did not draw parallels to the case, except to the extent of saying the jury would be asked to consider facts and infer guilt from those known facts. The prosecutor did not step outside the wide latitude of appropriate argument.

We see no error, let alone reversible error, in the statements complained of on appeal. We thus see no abuse of discretion in the district court's denial of Alston's motion for new trial based on prosecutorial error.

Alston, in wrapping up his arguments for a new trial, contends the cumulative effect of the errors requires us to grant him relief. But we have not found even a single error and thus need not engage in a cumulative error analysis. See *State v. Lowry*, 317

18

Kan. 89, 100, 524 P.3d 416 (2023) ("The cumulative error rule does not apply if there are no errors or only a single error.").

We find no basis for granting a new trial.

## CONCLUSION

Alston's convictions of first-degree murder and conspiracy to commit murder were not multiplicitous. Nor did the district court abuse its discretion when it denied Alston's motion for a new trial. We thus affirm Alston's convictions.

Affirmed.