NOT DESIGNATED FOR PUBLICATION

No. 127,693

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LANARD W. JONES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE BROWN, judge. Submitted without oral argument. Opinion filed June 12, 2026. Affirmed.

*Lindsay Kornegay*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE and ATCHESON, JJ.

MALONE, J.: Lanard W. Jones appeals his convictions and sentences for attempted second-degree murder and aggravated battery following a jury trial. Jones claims: (1) The district court erred by failing to instruct the jury that his use of force was presumptively lawful; (2) the district court erred in handling his motion for self-defense immunity; (3) the district court erred by failing to sufficiently inquire into Jones' dissatisfaction with trial counsel; and (4) the district court imposed an illegal sentence under K.S.A. 21-5109(d) by failing to sentence him only for the more specific crime of

1

attempted second-degree murder. After thoroughly reviewing the record and the parties' arguments, we find no reversible error and affirm the district court's judgment.

*Factual and procedural background*

On the evening of January 7, 2022, Jones and his son, Lachlan, got into an argument that escalated into a fight that culminated with Jones shooting Lachlan in the face. Their argument began over the phone when Lachlan questioned if there was something wrong with Jones; Lachlan was at a party and told Jones that he would stop by to see him later. When Lachlan arrived at Jones' house and parked in front of the driveway, Jones came around the side of the house into the front yard. Father and son resumed their argument and ended up inside Jones' house, where the argument quickly escalated into physical violence. Though there is no dispute of the outcome, Jones' and Lachlan's recollections of the incident diverge in the details.

According to Lachlan, Jones was agitated from the moment he arrived, "like something was off about him, I don't know what it was, but he was aggressive from the outset." He recalled that Jones let him inside the house, and after they walked inside, Jones took a handgun out of his pocket and tossed it on the couch. Jones then turned to him and said, "[Y]ou think I'm a ho, or you think I'm a bitch, or somethin' like that." According to Lachlan, "He just kept saying that." Jones began to push him and attempted to punch him, so Lachlan fought back, punching his father in the face, and knocking him to the floor.

At that point, Lachlan recalled that Jones picked himself up and went to the bathroom, where he screamed and punched the mirror. Lachlan immediately noticed that Jones had badly cut himself on the mirror when he punched through it; he worried that his father may have hit an artery and offered to take him to the hospital. But as Lachlan

2

turned around to look for his keys, Jones suddenly attacked him from behind. They struggled on the ground—shoving, wrestling, punching, and biting—until Lachlan felt a massive blunt force strike him in the face. Lachlan put his hand to his face and realized that he had been shot. Panicking, and thinking Jones might shoot him again, Lachlan ran out of his father's house to get help from a neighbor. But when he got no answer at the neighbor's, he ended up having Jones drive him to a nearby fire station.

According to Jones, Lachlan was the aggressor. Jones heard a loud screech when Lachlan pulled up to his house—he thought his son might have hit something and went to the driveway to meet him. Jones and Lachlan immediately began arguing, and Jones asked, "[S]o this why you come over? This is why you come to my house?" Lachlan allegedly responded, "[Y]ou know what I do," which Jones believed to be in reference to Lachlan's martial arts training. Jones remembered going toward his house and telling Lachlan to leave, but his son refused to listen and attacked him, "I never invited him to come in, he walked behind me and that's when he started swingin' on me."

Jones testified that he tried to defend himself and then "walked off, . . . went to the bathroom and . . . punched the mirror. . . . [J]ust to deflate." Jones recalled that Lachlan grabbed him and they resumed their fight, which spilled into the living room and onto the couch. Lachlan began strangling him and told Jones he was going to kill him. Fearing for his life, Jones grabbed his gun from the couch and blindly shot. He clarified that he did not actually intend to fire the gun. After shooting Lachlan, Jones feared for his son's life and called 911 to get an ambulance. But when the ambulance was slow to arrive, Jones decided to take Lachlan to a nearby fire station.

Jones' and Lachlan's accounts converge when they got to the fire station, where they banged on the door until several firefighters answered and let them inside. Once inside, the firefighters tended to Lachlan and alerted the police and paramedics to respond

3

to the station. The firefighters propped Lachlan up in a sitting position and waited for the ambulance to arrive; they were surprised that Lachlan could still speak despite having been shot in the face. Trying to assess the situation, the firefighters asked Jones what had happened and who had attacked Lachlan. Jones said that he had shot his son.

Jones, who was bleeding from the cuts and smelled strongly of alcohol, was fretting over Lachlan when the police arrived. Although he was agitated and angry, Jones repeatedly admitted to the firefighters and police that he had shot Lachlan as he pleaded with them to help his son. He claimed that he and Lachlan had "got into it," that Lachlan said he was "going to kill [him]," so he shot him. After Lachlan was taken to the hospital, Jones was placed under arrest, though he was taken to the hospital to treat his cuts.

The State initially charged Jones with one count of attempted second-degree murder. But after Jones filed a motion for self-defense immunity under K.S.A. 21-5231, seeking dismissal of the case, the State filed an amended complaint adding a count of aggravated battery. The district court held a combined preliminary hearing and hearing on the motion for self-defense immunity. Several witnesses including Lachlan testified for the State. Jones provided direct testimony at the hearing. But before the State's cross-examination, the hearing was continued to a later date. When the hearing resumed, Jones' counsel withdrew the motion "without prejudice" due to concerns that Jones' testimony at the immunity hearing would later be used against him at trial.

Over a year later, the district court permitted Jones' attorney to withdraw and appointed new counsel. Jones filed another pretrial motion for self-defense immunity. But Jones again withdrew the motion before any additional evidence was presented. Jones' counsel advised the district court that he had thoroughly discussed the decision to withdraw the motion with Jones, who agreed with the decision to withdraw it. Counsel clarified that the defense intended "to present a self-defense claim at trial."

4

The trial began on January 29, 2024. On the first day of voir dire, Jones' counsel informed the district court that Jones wanted to make a record that he disagreed with the decision to withdraw the immunity motion. But counsel did not renew the motion or ask the district court to rule on it. In response the district court summarized the procedural history—noting that the State had not been given the opportunity to cross-examine Jones at the evidentiary hearing—and then explaining the statutory authority providing for self-defense immunity. The district judge then stated, "[T]his is an issue of self-defense that can be developed for the jury, but there is nothing, based on the evidence presented, that can meet that standard of, in my opinion, reasonable or objective belief. And so I'll—number one, I'll just show the motion denied . . . ."

After voir dire was concluded but before the parties passed the panel for cause, Jones' counsel told the court that Jones wanted new counsel. He explained that this was the first time that Jones had expressed such a desire. Jones clarified that he did not want to represent himself but wanted the court to appoint new counsel. The district court asked Jones what reasons he had for the request. Jones expressed some hesitation about speaking in open court or in front of the prosecutor. He responded that he did not "really feel that [trial counsel] would really represent me well, due to the fact that he is to plea everyday, to plea everyday. And I don't feel like he's gonna fight for my innocence." Jones clarified that he was uncomfortable with the fact that his trial counsel had once been a prosecutor but refused to elaborate on any other reasons supporting his request and that he and his counsel simply saw the case differently. The district court denied the request for new counsel. After the district court made its ruling, Jones added that he and his counsel had disagreed about calling a character witness; the court responded that a decision about calling a witness was up to counsel.

The State proceeded with its case, presenting the testimony of the numerous emergency personnel involved in the incident as well as Lachlan's recollections of the

5

events. Following the State's case, Jones took the stand to tell his side of the story and the events that led to the shooting. The majority of his testimony related to his belief that he had acted in self-defense—that said, Jones testified that although he feared for his life while he was fighting Lachlan, he had never actually intended to fire the gun.

On the fourth day of trial, Jones filed several pro se motions, including a motion for the dismissal of his trial counsel and the appointment of a new attorney. The district court stated it had read the motions thoroughly and asked Jones if he had any other arguments or new information that had emerged since the issues with his counsel had been addressed during voir dire. Jones replied, "A lot of things occurred that's new, but I just—it's basically the same thing." The district court denied the pro se motions.

After the evidence, the district court instructed the jury, including lesser included offense instructions on both counts. After hearing the closing arguments, the jury found Jones guilty of attempted second-degree murder and aggravated battery as charged.

On March 28, 2024, the district court sentenced Jones to 100 months' imprisonment for the attempted second-degree murder conviction and a consecutive term of 43 months' imprisonment for the aggravated battery conviction. Jones timely appealed the district court's judgment.

*Did the district court err by failing to instruct the jury that Jones' use of force was presumptively lawful?*

Jones first claims the district court did not properly instruct the jury on self-defense. He contends the district court's self-defense instruction was clearly erroneous because it did not include the K.S.A. 21-5224(a) presumption of reasonableness of the use of deadly force against a person unlawfully in one's residence. Jones acknowledges he did not request the instruction at trial. The State maintains that such an instruction was

6

factually inappropriate under the circumstances, and, alternatively, that the failure to give the instruction was not clear error.

> "When analyzing jury instructions, appellate courts follow a three-step process: (1) determine whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) consider the merits of the claim to determine whether error occurred below; and (3) assess whether the error requires reversal—in other words, whether the error can be deemed harmless. [Citation omitted.]" *State v. Hollins*, 320 Kan. 240, 242, 564 P.3d 778 (2025).

"At the second step, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record." 320 Kan. at 242. When the issue is whether an instruction should have been given, this court reviews whether the instruction accurately reflects the law. *State v. Buck-Schrag*, 312 Kan. 540, 550, 477 P.3d 1013 (2020). If so, it is legally appropriate. 312 Kan. at 550-51. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. See *State v. Mendez*, 319 Kan. 718, 727, 559 P.3d 792 (2024).

When a party raises a jury instruction issue for the first time on appeal, this court must determine whether the failure to give the instruction was clearly erroneous. K.S.A. 22-3414(3); *State v. Turner*, 318 Kan. 162, 166-67, 542 P.3d 304 (2024). To be clearly erroneous, the instruction must have been legally or factually appropriate and this court must be firmly convinced the jury would have reached a different verdict had the instruction been given. As the party alleging the error, Jones has the burden to show both error and prejudice. See *Mendez*, 319 Kan. at 727-28.

Although the district court instructed the jury on self-defense, Jones argues the court should have included the presumption found in K.S.A. 21-5224(a). The district court's instruction on self-defense stated:

> "The defendant raises self-defense as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving the defendant is guilty. The State has the burden to disprove this defense beyond a reasonable doubt. The State's burden of proof does not shift to the defendant."

The district court also instructed the jury:

> "Defendant claims his use of force was permitted as self-defense. Defendant is permitted to use physical force against another person including using a weapon when and to the extent that it appears to him and he reasonably believes such physical force is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.
>
> "Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.
>
> "When use of force is permitted as self-defense, there is no requirement to retreat."

Jones does not assert any error in the contents of these instructions. Instead, he focuses on the district court's failure to include the statutory presumption of K.S.A. 21-5224(a), that he had a reasonable belief that deadly force was necessary to prevent death or great bodily harm because Lachlan had unlawfully or forcefully entered his home.

8

K.S.A. 21-5224(a) states in part:

> "(a) For the purposes of K.S.A. 21-3211 and 21-3212, prior to their repeal, or K.S.A. 21-5222 and 21-5223, and amendments thereto, a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm to such person or another person if:
>
> (1) The person against whom the force is used, at the time the force is used:
>
> (A) Is unlawfully or forcefully entering, or has unlawfully or forcefully entered, and is present within, the dwelling, . . . of the person using force."

We must determine whether a jury instruction under K.S.A. 21-5224(a) would have been legally and factually appropriate at Jones' trial. To be legally appropriate, a jury instruction must fairly and accurately state the applicable law. An appellate court exercises unlimited review of the legal appropriateness of an instruction. *State v. Wimbley*, 313 Kan. 1029, 1034, 493 P.3d 951 (2021). Because the instruction Jones argues should have been given accurately states the law applicable to self-defense, the parties agree it was legally appropriate. The parties disagree about whether such an instruction would have been factually appropriate under the evidence presented.

Jones asserts an instruction on the K.S.A. 21-5224(a) presumption was factually appropriate because there was evidence to support that Lachlan had unlawfully or forcefully entered, and was present within, his home at the time deadly force was used. Jones argues that he told Lachlan not to come inside his home after Lachlan pulled up in his driveway. Jones testified, "[A]fter that I walk into the house, I told him to leave. I said I'm goin' in the house, leave. . . . I never invited him to come in, he walked behind me and that's when he started swingin' on me." Additionally, he recalled that after he punched the mirror and injured himself, he "told [Lachlan] to get out." Jones' statements that he told his son to leave arguably establish that Lachlan lacked authority to enter his

9

father's home. Thus, some evidence, viewed in the light most favorable to Jones, supported an instruction under K.S.A. 21-5224(a).

The State contends an appellate court should use a more rigorous standard to review factual appropriateness in cases in which the defendant did not request the instruction at trial. The State argues that "[w]hen a defendant does not request an instruction, the evidence should be viewed without deference to defendant." But our Supreme Court has never adopted this argument, applying the "viewed in the light most favorable" standard to determine whether an unrequested jury instruction was factually appropriate as recently as *Mendez*. 319 Kan. at 727. Absent some indication the Kansas Supreme Court is departing from a previous position, this court is duty bound to follow its precedent. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022).

While the evidence that Lachlan forcefully or unlawfully entered Jones' residence was not particularly strong, the jury was presented with two conflicting stories of the shooting. And Jones' version of the events, if believed, would support the conclusion that Lachlan entered the house unlawfully. Because there was some evidence to support an instruction on the K.S.A. 21-5224(a) presumption, it was factually appropriate.

Because the instruction was legally and factually appropriate, the next question is whether the district court's failure to give it was clearly erroneous. "When an unrequested instruction would have been legally and factually appropriate, its absence amounts to clear error requiring reversal only if 'the reviewing court . . . is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Turner*, 318 Kan. at 170. And the burden is on the party alleging error to show both error and prejudice. See *Mendez*, 319 Kan. at 727-28.

10

Jones contends that if the jury had been given an instruction informing it that he was entitled to the presumption that he had a reasonable belief that the use of deadly force was necessary, the outcome of the trial would have been different. We agree that an instruction including the presumption may have had some effect on the jury's deliberations. But that is not the standard we apply to determine whether there was clear error. Jones must firmly convince this court that the jury would have reached a different verdict had his instruction been given. Several factors weigh against such a conclusion.

First, Jones fails to address the fact that the instruction would have provided merely a presumption of reasonableness, and that presumption is rebuttable. Jones asserts that the instruction would have told the jury that his "use of force was presumptively lawful" but that is not all that an instruction would have stated. The instruction also would have stated: "This presumption may be overcome if you are persuaded beyond a reasonable doubt that the person did not reasonably believe that use of force likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to [himself]." PIK Crim. 4th 52.200 (2021 Supp.). In other words, the jury would have been told to assume that Jones' actions were reasonable, but it still would have been free to give credit to Lachlan's testimony or discount Jones' version of events.

Second, the weight of the evidence against Jones must be considered. The jury was provided with the competing narratives of Jones and Lachlan. Jones testified that Lachlan was the initial aggressor, but Lachlan testified that Jones was the initial aggressor. The jury assessed the credibility of the witnesses. Based on the verdict, the jury believed Lachlan's version of the incident over Jones'. There is no reason for this court to be firmly convinced the jury would have suddenly found Jones' testimony more credible had the instruction on the presumption under K.S.A. 21-5224(a) been given.

11

Third, we must consider the jury instructions on self-defense that were given at Jones' trial. The district court instructed the jury that the State had the burden to disprove Jones' claim of self-defense beyond a reasonable doubt and that "[t]he State's burden of proof does not shift to the defendant." The district court also instructed the jury that Jones was permitted to use deadly force against Lachlan to the extent it appeared to Jones and he reasonably believed such force was necessary to prevent great bodily harm. Finally, it instructed the jury that when force is permitted as self-defense, "there is no requirement to retreat." The instructions given by the district court fairly and accurately stated the law on self-defense and allowed Jones to present his defense to the jury.

Finally, Jones' own testimony weighed against the conclusion that he even intended to use the gun—whether in self-defense or not. While Jones claimed he intentionally grabbed the gun and pointed it at Lachlan's head, he repeatedly stated that he did not intentionally pull the trigger. The fact that Jones' use of deadly force was not intentional further weighs against the conclusion that he actually believed that deadly force was necessary under the circumstances.

In sum, given the nature of the evidence against Jones and the contours of his particular reliance on self-defense, we are not firmly convinced by Jones that the jury would have reached a different verdict had the instruction on the presumption under K.S.A. 21-5224(a) been given. Thus, we conclude the district court's failure to give the instruction was not clearly erroneous requiring a reversal of Jones' convictions.

*Did the district court err in handling Jones' motion for self-defense immunity?*

Next, Jones claims the district court erred when it failed to resolve evidentiary conflicts and make factual findings before it ostensibly denied his motion for self-defense immunity. The State maintains the district court did not abuse its discretion and was not

12

required to make factual findings or resolve evidentiary conflicts "[b]ecause the defense had twice withdrawn its immunity motions."

The parties agree that an appellate court applies a bifurcated standard of review for self-defense immunity claims—when, in fact, such a motion was made and ruled on in district court. An appellate court reviews the district court's factual findings for substantial competent evidence and reviews the district court's legal conclusion drawn from those facts de novo. *State v. Hardy*, 305 Kan. 1001, 1012, 390 P.3d 30 (2017).

This issue is presented to this court in an unusual manner. Jones presumes the district court denied his pretrial immunity motion but did so without resolving evidentiary conflicts and making sufficient factual findings. The State points out that Jones voluntarily withdrew his motion for self-defense immunity—not once, but twice—and the district court never ruled on the motion. A withdrawn motion is not properly before an appellate court for review. See *State v. Fritz*, 299 Kan. 153, 156, 321 P.3d 763 (2014).

Jones initially filed a motion for self-defense immunity seeking dismissal of the case soon after the State commenced prosecution. The district court held a combined preliminary hearing and hearing on the motion for self-defense immunity. Jones provided direct testimony at the hearing but withdrew the motion before the State was allowed to cross-examine Jones. In withdrawing the motion, counsel expressed concerns that Jones' testimony would later be used against him at trial. Over a year later, after Jones had been appointed new counsel, he filed another pretrial motion for self-defense immunity. But Jones again withdrew the motion before any additional evidence was presented. Jones' counsel advised the district court that he had thoroughly discussed the decision to withdraw the motion with Jones, who agreed with the decision to withdraw it. Counsel clarified that the defense intended "to present a self-defense claim at trial."

13

On the first day of voir dire, Jones' counsel informed the district court that Jones wanted to make a record that he disagreed with the decision to withdraw the immunity motion. But counsel did not renew the motion or ask the court to rule on it. In response, the district court summarized the procedural history and the fact that Jones had twice withdrawn the motion, noting Jones withdrew it before the State had the chance to cross-examine him. The district judge found the motion would not have been successful based on the evidence presented and concluded, "I'll just show the motion denied."

Based on this record, we agree with the State's assertion that Jones voluntarily withdrew his pretrial motions for self-defense immunity and the district court did not rule on the motions, despite the court's comment that it would "show the motion denied." The parties and the district court were aware the hearing on the motion was never completed and Jones had withdrawn the motion. During voir dire, defense counsel simply wanted to make a record that Jones disagreed with the decision to withdraw the motion, but counsel did not renew the motion or even argue that the motion should have been granted. The State made no record in response to counsel's announcement. There was no motion before the district court to rule on. Jury selection had already been completed and the State was ready to present its evidence, so it was obviously late for the district court to be addressing a pretrial motion for immunity from prosecution. Jones was allowed to present his theory of self-defense to the jury. Because Jones voluntarily withdrew both motions for self-defense immunity and never renewed the motion a third time, there was nothing for the district court to rule on and there is nothing for this court to review. We conclude the district court did not err in handling Jones' motion for self-defense immunity.

*Did the district court sufficiently inquire into Jones' dissatisfaction with counsel?*

Next, Jones claims the district court abused its discretion by failing to inquire about his dissatisfaction with his trial counsel. He argues the district court's inquiry

14

should not have been conducted in open court or in the presence of the prosecutor. The State maintains the district court conducted a sufficient inquiry into the reasons behind Jones' alleged dissatisfaction with counsel. The State argues Jones provided enough information for the district court to rule on the matter and there "was no need to dismiss the prosecutors from the courtroom or conduct a further inquiry in chambers."

When a defendant articulates dissatisfaction with counsel, a district court has a duty to inquire into a potential conflict. An appellate court reviews a district court's inquiry about a defendant's dissatisfaction with counsel for abuse of discretion. *State v. Valdez*, 316 Kan. 1, 25-26, 512 P.3d 1125 (2022). An abuse of discretion occurs when judicial action is based on an error of law or fact or is unreasonable. 316 Kan. at 25. The party asserting the district court abused its discretion bears the burden of showing it. *State v. Peters*, 319 Kan. 492, 497-98, 555 P.3d 1134 (2024).

Jones does not argue that the district court failed to conduct an inquiry but that the court's inquiry was insufficient because it occurred in front of the State after he expressed hesitation to fully explain himself in open court or in the presence of the prosecution. A proper inquiry requires the district court to provide the defendant with the *opportunity* to explain if they have a conflict of interest, irreconcilable disagreement, or an inability to communicate with their counsel. *Valdez*, 316 Kan. at 25-26. Asking a "'single, open-ended question by the trial court may suffice if it provides the defendant with the opportunity to explain a conflict of interest.'" 316 Kan. at 25. A district court need not make "'a detailed examination of every nuance'" of a defendant's claim of dissatisfaction with counsel. *State v. Toothman*, 310 Kan. 542, 554, 448 P.3d 1039 (2019).

Jones admits that no Kansas case has held that an inquiry into a defendant's dissatisfaction with their counsel must take place in chambers or outside the presence of the State. In fact, such a procedure may have been improper, amounting to the district

15

court engaging in an ex parte communication with one party. More importantly, the record shows that the district court gave Jones ample opportunity to explain his position on his dissatisfaction with counsel and conducted a sufficient inquiry into the matter, even if it did not do so in chambers outside the presence of the prosecutor.

After voir dire, Jones' trial counsel, Bach Hang, alerted the district court that Jones stated that he wanted to dismiss his current attorney and be appointed new counsel. After clarifying that Jones did not want to represent himself, the judge gave Jones an opportunity to explain his dissatisfaction with counsel. Jones responded:

> "Well, I don't want to burden the Court with this and I understand that this is a inconvenience to all of us that I decided that I wanted to go this route, but at the same time, I don't really feel that Mr. Hang would really represent me well, due to the fact that he is to plea everyday, to plea everyday. And I don't feel like he's gonna fight for my innocence.
> "And on top of that, for my hearing, prior to when I was in the courtroom, that you also worked with the—with you guys, right, I mean, in the same office and that kinda bugs me, too. Was that—am I—is that my wrong for that? I would like to see counsel that really don't have any connections to that, outside of a judicial system, if that makes sense."

Hang asked the district court to clarify the grounds for Jones' request, and he again explained that Hang's prior employment as a prosecutor made him feel uncomfortable:

> "[I]t's the whole thing, you gotta feel a certain way about this and it's kinda like I don't wanna say too much because then it effects the whole—the case but—
> . . . .
> ". . . It just kind of bug me. Yeah, I don't want to talk about the facts of the case, but just certain things that he said to me that I really didn't agree with.
> . . . .
> ". . . Just seeing things differently."

16

The district court discussed Jones' concern about his counsel's prior position, vouching for Hang's ability and experience as a defense attorney. After speaking to Jones about his concerns, the district court denied his motion for substitute counsel. In response, Jones stated that he also had a character witness that he wanted to call but did not want to discuss the matter "in front of them." The district court replied that the decision to call particular witnesses was up to Jones' lawyer, "[I]t's his decision. Just make sure that your attorney understands who they are, what you think that they know and then the attorney will do their—you know, practice their trade."

Jones argues this exchange about his dissatisfaction was inadequate because he "articulated reservations about speaking in open court or in front of the prosecutor." Despite the district court's decision not to take the matter up in chambers or away from the State, the record shows that Jones managed to explain his position—that he did not get along with his counsel and thought his counsel would not call a particular character witness—without going into greater detail. Even if Jones was reluctant to divulge additional information, the district court received ample information to make a decision about whether Jones had articulated justifiable dissatisfaction with counsel. And the district court was correct in pointing out that matters of trial strategy, such as which witnesses to call, are left to the discretion of counsel. See *Edgar v. State*, 294 Kan. 828, 838-39, 283 P.3d 152 (2012). Ultimately, the district court granted Jones an adequate opportunity to explain himself and had plenty of information to rule on Jones' motion.

The district court inquired into Jones' problems with his counsel and reasonably determined that he had not shown justifiable dissatisfaction for the appointment of new counsel. We conclude Jones has failed to show the district court abused its discretion by failing to sufficiently inquire into his dissatisfaction with trial counsel.

17

*Did the district court impose an illegal sentence under K.S.A. 21-5109(d) by failing to sentence Jones only for the more specific crime of attempted second-degree murder?*

Finally, Jones claims his sentence is illegal under K.S.A. 21-5109(d) because he is being punished for two crimes that arose from the same conduct. Jones asserts he should have been sentenced only for the more specific crime of attempted second-degree murder. The State contends the district court properly sentenced Jones on both counts, as K.S.A. 21-5109(d) was not implicated in this case.

Jones did not raise this claim in district court. But because he is arguing his sentence is illegal, which he can do at any time while he is serving the sentence, this court may address the merits of his claim. See K.S.A. 22-3504 (court may review illegal sentence at any time while defendant is serving the sentence, and illegal sentence includes sentence that does not comport with applicable statute). The State does not dispute Jones' assertion that we may address this issue for the first time on appeal.

Whether a sentence is illegal is a question of law subject to unlimited review. See *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024). Likewise, statutory interpretation presents a question of law subject to unlimited review. 319 Kan. at 342.

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). An appellate court must first attempt to determine legislative intent through the statutory language enacted, giving common words their ordinary meanings. 315 Kan. at 698. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and should refrain from reading something into the statute that is not readily found in its words. 315 Kan. at 698. When there is no ambiguity, the court does not need to resort to statutory construction. Only when the statute's language or text is unclear or ambiguous does the court use

canons of construction or legislative history to construe the Legislature's intent. *State v. Betts*, 316 Kan. 191, 198, 514 P.3d 341 (2022).

When a defendant's conduct violates more than one criminal statute, K.S.A. 21-5109(a) permits the State to charge and convict the defendant of multiple crimes:

> "(a) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment."

But the statute places limits on that discretion. Jones advances his claim under one of those limitations, set out in subsection (d):

> "(d) Unless otherwise provided by law, when crimes differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct, the defendant:
> (1) May not be convicted of the two crimes based upon the same conduct; and
> (2) shall be sentenced according to the terms of the more specific crime." K.S.A. 21-5109(d).

K.S.A. 21-5109(d) was enacted in 2010 and was meant to codify the "general [versus] specific offense doctrine" present in Kansas caselaw. See *State v. Ruiz*, 317 Kan. 669, 681, 538 P.3d 828 (2023). The subsection (d) limitation applies "when crimes differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct." K.S.A. 21-5109(d). The Kansas Supreme Court has held that "[t]his indicates that a statute describes a crime that is more specific than another only if it prohibits identical conduct plus an additional, specifying element." *State v. Johnson*, 321 Kan. 357, 373, 580 P.3d 20 (2025).

19

Cases that have applied K.S.A. 21-5109(d) support the conclusion that a crime is not a more specific version of another if the two offenses prohibit different conduct. In *State v. Alston*, 318 Kan. 979, 988, 551 P.3d 116 (2024), our Supreme Court concluded that K.S.A. 21-5109(d) is inapplicable to first-degree murder under an aiding and abetting theory and conspiracy to commit first-degree murder because they consist of a "different concept." The court explained "[n]either [offense] is more general nor more specific than the other because each targets a different theory of liability." 318 Kan. at 988.

Panels of this court have reached similar results on the inapplicability of K.S.A. 21-5109(d) when offenses prohibit different conduct. *State v. Stohs*, 63 Kan. App. 2d 500, 506, 531 P.3d 533 (2023) (interference with a law enforcement officer not more specific crime than felony identity theft because "identity theft prohibits different conduct" from interference with a law enforcement officer); *State v. Casteel*, No. 127,236, 2025 WL 1671998, at *4 (Kan. App. 2025) (unpublished opinion) (attempted voluntary manslaughter not more specific than aggravated battery because "statutes are aimed at different conduct and require entirely different elements of proof"), *rev. denied* 321 Kan. 791 (2025); *State v. Jackson*, No. 127,841, 2025 WL 2427732, at *3 (Kan. App. 2025) (unpublished opinion) (battery on a corrections officer not more specific than aggravated battery because "[a]ggravated battery does not prohibit the same conduct as battery on a corrections officer"), *rev. denied* 321 Kan. 792 (2025).

Jones argues that because the same underlying conduct—his shooting of his son—resulted in two convictions, K.S.A. 21-5109(d)(2) requires that he be sentenced only for one of the convictions. But the elements of these offenses each required the State to prove different facts to establish each offense. The attempted second-degree murder charge required proof that he performed an overt act toward the commission of an intentional murder in the second degree and did so with intent to commit murder but failed to complete the murder. And the aggravated battery charge required proof that Jones

20

knowingly caused great bodily harm or disfigurement to Lachlan. A defendant can be found to have committed all the elements of attempted second-degree murder without any finding that the defendant caused great bodily harm or disfigurement to the victim.

Jones' conduct established the commission of more than one crime under the laws of Kansas, so K.S.A. 21-5109(a) permitted the State to charge and convict Jones of multiple crimes. He received consecutive sentences for his separate convictions of attempted second-degree murder and aggravated battery. Although both charges arose from the same act—Jones' shooting of his son—the two crimes charged by the State prohibit different conduct. They do not prohibit identical conduct with varying degrees of specificity. Because K.S.A. 21-5109(d) only limits the State's charging discretion where there are multiple crimes that differ only because one prohibits a designated type of conduct generally and the other prohibits a more specific instance of the same conduct, the statute is not implicated here. Thus, we conclude Jones' sentence is not illegal.

Affirmed.